SPORTSCO ENTERPRISES, Appellant, *v.* WILLIAM W. MORRIS, WILLIAM P. MORRIS, JAYMIE BODENSTEINER, DAWN DUDAS and WESLEY ANN MORRIS, Respondents.

No. 25592

May 30, 1996                              917 P.2d 934

---

[Rehearing denied December 11, 1996]

*Robert A. Massi, Ltd.,* Las Vegas, for Appellant.

*Foley & Jones,* Las Vegas, for Respondents.

## OPINION

By the Court, ROSE, J.:

In April 1989, respondent William W. Morris executed a confession of judgment of $750,000 in favor of Sportsco Enterprises, Inc. (Sportsco). In October 1989, Morris assigned part of his rights in a private sports box at the University of Nevada, Las Vegas (UNLV) to a friend for $32,000 and the remainder of those rights to his children for lesser or no consideration. Sportsco sued Morris and his children for fraudulent transfer pursuant to NRS Chapter 112, the Uniform Fraudulent Transfer Act, and for fraud. The district court entered judgment in favor of Morris on both causes of action.

We conclude that the district court erred in concluding that Morris's interest in the box was not property liable to execution or capable of fraudulent transfer. We therefore reverse its judgment and remand the case for further proceedings in regard to Sportsco's action for fraudulent transfer.

### FACTS

In August 1988, respondent Morris entered into a "license agreement" with the Board of Regents of the University of Nevada System (the University), on behalf of UNLV, for the use of a private box at the Thomas and Mack Center. The purpose of the agreement was for Morris to view UNLV basketball games. The agreement was for a five-year period, beginning on July 1, 1988, and ending on June 30, 1993. Morris agreed to pay the University $24,750 a year as a "license fee" and to purchase a minimum of ten and a maximum of twenty season basketball tickets for seating in the box. Under the agreement, Morris had the right to exclusive use of the private box during basketball games and other public events at the center, he could "sublicense" that use to third parties whom he chose, and he was under

no obligation to "sublicense" to the University when he did not purchase tickets to such events. When the center was used for convention purposes, Morris had the right to demand $4,000 a day in return for use of the box. At all other times, Morris was "entitled to the sole and exclusive right of access" to the box, subject to University approval, which could not be unreasonably withheld. Morris had the right to furnish and improve the box as he saw fit as long as the improvements met University standards and building and fire codes. Any improvements became the property of the University at the expiration of the term of the agreement.

On April 17, 1989, Morris executed a confession of judgment of $750,000 in favor of Sportsco in an unrelated matter. Almost six months later, on October 11, 1989, Morris assigned part of his rights in the box to a friend, C. Jay Nady. The written assignment provided that Morris assigned Nady four seats and an undivided "twenty-five percent" interest in the box for the remaining term of Morris's "lease" of the box from the University. Although the assignment referred to the "remaining four year term" of the lease, less than three years and nine months remained in that term. The assignment provided that Nady also receive four season tickets to UNLV basketball games and two season parking passes for parking in the private box owners' designated parking area. It also provided that Nady had the right to lease the box if Morris or his wife or his children did not exercise the option to renew the lease.[1] In exchange, Nady paid Morris $8,000 per year in advance as "rent" for the box, for a total of $32,000.

Also on October 11, 1989, Morris executed assignments of equal interests in his remaining rights to the box to each of his four children. Each child was assigned four seats and an undivided "18.75 percent" interest in the box for the remaining term of Morris's "lease." Each child also received four season tickets to UNLV basketball games and two season parking passes for parking in the private box owners' designated parking lot. Each assignment provided that the assignee child pay twenty-five percent of the "rent" per year for three years. Each child acknowledged that Nady had the right to lease the assignee's portion of the box if the assignee chose not to exercise the option to renew the lease. Each assignment stated that "for valuable consideration . . . the parties agree as follows." No amount of consideration was stated, and Morris admitted in his answer that he

---

[1]The district court's later written judgment included the finding of fact that around July 30, 1993, the University executed a new five-year "license agreement" for the box with Nady and three of Morris's children.

assigned his remaining rights in the box to his children for no consideration. (However, according to the terms of the assignments, the children agreed collectively to pay the rent for three years. If this assumption of part of Morris's rent obligation occurred, it constituted some consideration.)

Five months later, on March 20, 1990, Sportsco issued a Notice of Sheriff's Sale of Personal Property Under Execution concerning Morris's interest in the box. Pursuant to a sheriff's certificate of sale dated May 24, 1990, Sportsco became the owner of Morris's agreement with the University to use the box.

On August 22, 1990, Sportsco filed a complaint against Morris and his children, claiming two causes of action: fraudulent transfer pursuant to NRS Chapter 112, the Uniform Fraudulent Transfer Act, and fraud. On September 14, 1990, Sportsco filed an application for a temporary restraining order and a motion for a preliminary injunction. That same day, the district court entered an Order to Show Cause and Temporary Restraining Order. Six months later, on March 20, 1991, the district court denied Sportsco's motion for a preliminary injunction, stating that it was not satisfied that the rights to the box constituted a property interest subject to execution.

A bench trial was conducted on November 22, 1993. On February 7, 1994, the district court filed an Order and Judgment and its Findings of Fact and Conclusions of Law. The court entered judgment in favor of the defendants, dismissed Sportsco's complaint with prejudice, and ordered that execution documents concerning the box be considered void. The district court concluded: the assignments executed by Morris on October 11, 1989, assigning his interests in the box to Nady and Morris's children were valid and enforceable assignments; the defendants' rights to the box were not property which could be the subject of a fraudulent transfer or the subject of execution; and Sportsco did not meet its burden of proving fraud.

## DISCUSSION

This court will not set aside a district court's findings of fact unless they are clearly erroneous. Hermann Trust v. Varco-Pruden Buildings, 106 Nev. 564, 566, 796 P.2d 590, 592 (1990). Questions of law such as interpretation of statutory provisions are reviewed de novo by this court. SIIS v. United Exposition Services Co., 109 Nev. 28, 30, 846 P.2d 294, 295 (1993).

### Property Interest

In the instant case, the district court concluded that the rights in the box were not property for purposes of either execution or

the Uniform Fraudulent Transfer Act. We conclude that the district court erred as a matter of law and that Morris's interest in the private sports box in this case was property by statutory definition and under relevant case law.

NRS 21.080(1) provides:

> All goods, chattels, moneys and other property, real and personal, of the judgment debtor, or any interest therein of the judgment debtor not exempt by law, and all property and rights of property seized and held under attachment in the action, shall be liable to execution. . . . [S]hares and interests in any corporation or company, and debts and credits and other property not capable of manual delivery, may be attached in execution in like manner as upon writs of attachments. . . .

In NRS 21.090, the Legislature provided express exemptions from execution for some property interests. None of these exemptions apply to Morris's interest in the private box. "Of course, all personal property and salable real estate owned by a judgment debtor is subject to execution unless specifically exempted by statute." Krysmalski by Krysmalski v. Tarasovich, 622 A.2d 298, 310 n.7 (Pa. Super. Ct.), *appeal denied,* 636 A.2d 634 (Pa. 1993).

Statutes permitting execution against specified kinds of property must be liberally construed for the benefit of creditors. 33 C.J.S. *Executions* § 18 (1942). The general rule is that "if the interest is assignable or transferable, it is subject to execution." 30 Am. Jur. 2d *Executions and Enforcement of Judgments* § 165 (1994). "[W]hen property or a right in or to property is salable it is seizable, and . . . the sheriff can sell upon execution and convey 'any property, real or personal, tangible or intangible, which may be sold and transferred by the owners thereof at voluntary sale.'" Gordon v. Rees, 36 A.2d 841, 843 (Pa. Super. Ct. 1944) (quoting Brennan v. Pittston Brewing Corp., 26 A.2d 334, 335 (Pa. 1942)). In this case, Morris's interest was transferable and, whether deemed an interest in real property or some kind of intangible personal property, was an asset liable to execution pursuant to NRS 21.080(1). *Cf.* Greear v. Greear, 303 F.2d 893, 896 (9th Cir. 1962) (holding that NRS 21.080 authorizes the execution upon all property except spendthrift trusts and therefore seems to contemplate the ability to reach all other equitable interests).

The definition of property in regard to fraudulent conveyances

is, if anything, even broader than the definition of property for execution. NRS 112.150(10) defines property as "anything that may be the subject of ownership." Morris clearly owned some kind of interest in the box: he was able to sell part of that interest to Nady for $32,000. That interest included the right to exclusive use of the private box during basketball games and other public events at the center and the right to "sublicense" that use to third parties. It did not include any obligation to "sublicense" to the University when the owner of the interest did not purchase tickets to other events. When the center was used for convention purposes, the owner of the interest had the right to demand $4,000 a day in return for use of the box. At all other times, the owner of the interest was "entitled to the sole and exclusive right of access" to the box, subject to University approval, which could not be unreasonably withheld. The owner of the interest also had the right to furnish and improve the box. The interest appears to have been a lease, definite in its duration and its description of the property involved.[2] *See* State, Dep't Commerce v. Carriage House, 94 Nev. 707, 709, 585 P.2d 1337, 1339 (1978).

## Fraudulent Transfer

The district court determined that Sportsco failed to prove fraud. However, this determination disposed only of Sportsco's action for fraud. Fraudulent conveyance under NRS Chapter 112 does not require proof of intent to defraud. Pursuant to NRS 112.190(1), where a creditor's claim arose before a transfer made by a debtor, the transfer is fraudulent if the debtor did not receive "reasonably equivalent value in exchange" and was insolvent at the time of making the transfer or became so as a result of the transfer.[3] *Cf.* NRS 112.180(1)(b).

---

[2]Although the written agreement between the University and Morris was designated a "license," the agreement even calls the arrangement between the University and Morris a "lease" at one point. Morris himself referred to the arrangement as a "lease" in transferring part of his interest to Nady in return for "rent" totalling $32,000. Morris's interest in the box was obviously not a mere license. The University could not revoke it, and Morris could transfer it. *See* State, Dep't Commerce v. Carriage House, 94 Nev. 707, 709, 585 P.2d 1337, 1339 (1978). However, the exact categorization of Morris's property rights to the box is not crucial to this case.

[3]NRS 112.190(1) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

Generally, the creditor bears the burden of proof both with respect to the insolvency of the debtor and the inadequacy of consideration. Matusik v. Large, 85 Nev. 202, 205, 452 P.2d 457, 458 (1969). In *Matusik,* the debtor received fair consideration for the transfer of his property. *Id.* at 207-09, 452 P.2d at 460-61. However, where the creditor establishes the existence of certain indicia or badges of fraud, the burden shifts to the defendant to come forward with rebuttal evidence that a transfer was not made to defraud the creditor. Territorial Sav. & Loan Ass'n v. Baird, 781 P.2d 452, 462 n.18 (Utah Ct. App. 1989); *see also* Erjavec v. Herrick, 827 P.2d 615, 617 (Colo. Ct. App. 1992). The defendant must show either that the debtor was solvent at the time of the transfer and not rendered insolvent thereby or that the transfer was supported by fair consideration. Kirkland v. Risso, 159 Cal. Rptr. 798, 802 (Ct. App. 1980); *see also* Harvey v. Harvey, 841 P.2d 375, 377 (Colo. Ct. App. 1992). Generally recognized indicia of fraud include

> lack of consideration for the conveyance, the transfer of the debtor's entire estate, relationship between transferor and transferee, the pendency or threat of litigation, secrecy or hurried transaction, insolvency or indebtedness of the transferor, departure from the usual method of business, the retention by the debtor of possession of the property, and the reservation of benefit to the transferor.

Montana Nat. Bank v. Michels, 631 P.2d 1260, 1263 (Mont. 1981).

A number of these indicia exist here: relationship between the transferor and transferees, the pendency or threat of litigation, and insolvency or indebtedness of the transferor. Morris's indebtedness to Sportsco in the sum of $750,000 was established by a confession of judgment. Morris has not disputed that he was insolvent at the time he transferred his interest in the box to his children, and his deposition at his post-judgment examination and his actions indicate that he was. *See* NRS 112.160.[4] His deposition also shows that he was a defendant or potential defendant in a number of pending or threatened lawsuits regarding his debts. The relationship between Morris and the transferees was extremely close, that of parent and child.

---

[4]NRS 112.160 provides in part:

> 1. A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation.
> 2. A debtor who is generally not paying his debts as they become due is presumed to be insolvent.

Sportsco also argues that the transfer was marked by lack of consideration. Morris asserts that the value of the interest that he transferred to his children was nothing; he therefore concludes that they appropriately paid him no consideration. The record flatly contradicts Morris's assertion that the interest transferred had no value. However, if his children actually assumed part of Morris's obligation to pay rent, as set forth in the written assignments, they provided Morris with some consideration. Whether this consideration amounted to reasonably equivalent value in exchange for the transfer of the majority of Morris's interest in the box remains an issue.

On the same day that Morris assigned a majority of his interest in the box to his children, he transferred a minority interest to Nady for $32,000. Although the assignments executed by Morris stated that Nady received a 25 percent interest in the box and the children only 18.75 percent interests, Nady and each of the children were assigned four seats and four season tickets out of a total of twenty; i.e., in effect Nady and each child received equal interests of 20 percent. Under Morris's agreement with the University, four seats in the box over four years cost Morris $19,800; four seats for three years and nine months cost about $18,560. In contrast, Nady paid Morris $32,000 for four seats for a term of less than three years and nine months. This provided Morris with a profit of more than $13,400 over what he paid the University for that term. Assuming this was the market value of a 20 percent interest in the box for that term, Morris forwent a profit of well over $50,000 in assigning the other 80 percent interest to his children in return only for their assumption of the rent for the final three years of the lease. (The children received a total of 80 percent interest in the box for a term of almost three years and nine months. The children's payment of 100 percent of the rent for three years nearly equals payment of 80 percent of the rent for that term.)

We conclude that we must remand this case for the district court to decide whether under all the relevant facts Morris received reasonably equivalent value in exchange for the transfer of the majority of his interest in the box to his children.

## CONCLUSION

Morris's interest in the sports box constituted property. We therefore reverse the district court's judgment in regard to Sportsco's cause of action for fraudulent transfer and remand for further proceedings to determine whether Morris received reasonably equivalent value in exchange for transferring the majority of his interest in the box to his children.

STEFFEN, C. J., and YOUNG and SHEARING, JJ., concur.

SPRINGER, J., dissenting:

William Morris entered into an agreement with UNLV to "obtain a license to *use* one of the said boxes" at the Thomas and Mack Center. The use of this box was offered by UNLV to Morris "for the purpose of permitting [Morris] to view from the box collegiate basketball games presented by the University . . . ." As I see the arrangement between Morris and UNLV, it was very similar to a season ticket by which the ticketholder/licensee would be permitted to use a certain seat to watch basketball games—hardly the kind of interest that could be characterized as "property." In fact, Morris and UNLV agreed in writing that the box license "creates no possessory interest which would be subject to property taxes."

Just because Morris and UNLV believed that the license had no taxable value is not, of course, conclusive on the question of whether Morris had a property right or had any interest that was of value; still, I find nothing in the record that indicates that Morris' right to watch basketball games, by virtue of what amounts to a glorified season ticket, can be translated into either a property right or an interest of value that would be subject to execution.

Morris was permitted to watch games from the box only for so long as he paid a very high fee for the privilege. In addition to paying the box fee, Morris was required by his agreement with UNLV to purchase ten season basketball tickets for seating in the box. Morris was prohibited from selling his tickets for a profit and, as I read the agreement, prohibited from "scalping" his box at cost higher than that which he was paying for the use of the box.

Morris' use of the box was conditioned upon his paying to UNLV $24,750.00 per year. Morris assigned a twenty-five per cent right in the box (four seats) to Jay Nady, who in turn agreed to pay $8,000.00 per year for the privilege. Morris assigned to his four children the remaining interest in the box, provided that they pay their proportionate share "of the rent per year" for the three remaining years under the agreement.

Now there may be something sinister in the assignment transaction, but I cannot see it; and neither could the trial judge. It should be noted that the trial judge's decision in favor of Morris was based on a record that we do not now have before us. The trial court based its decision on the "records and documents on file herein and admitted as evidence." Sportsco failed to designate the entire record as the Record on Appeal and, specifically, did not designate the trial exhibits or the deposition transcripts entered as evidence. We have ruled that the "lack of a trial record precludes our consideration of the issues" raised on appeal.

Turner v. Staggs, 89 Nev. 230, 510 P.2d 870 (1973). "When the evidence on which a district court's judgment rests is not properly included in the record on appeal, it is assumed that the record supports the lower court's findings. NRAP 10." Raishbrook v. Estate of Mayley, 90 Nev. 415, 528 P.2d 1331 (1974). I would note that there is no Statement of Evidence or any other agreed upon statement under NRAP 10. Under these circumstances I assume that the trial court's finding and conclusions are supported by the absent record.

I do not think a season ticket or a season box is property; and, if it were, the property would certainly lose its value at the end of the sports year. Whatever the value of the "usufruct" that a season ticket or box holder might have is certainly cancelled out by the obligation for continued payment that is attached to the privilege. I have been cited to no evidence in this case to show me that a holder of one of these boxes is in a position to peddle the privilege for a profit or that, if this were possible, there is a property interest of value that would be subject to execution proceedings. Under these circumstances, I would give deference to the trial court and affirm its judgment.