948 P.2d 151

**DBSI/TRI V, an Idaho Limited Partnership, and DBSI/TRI VII, an Idaho Limited Partnership, and DBSI/TRI VIII, an Idaho Limited Partnership, Plaintiffs–Appellants,**

v.

**Fred H. BENDER, Philip A. McLennan, Bender and Bender, an Idaho Limited Partnership, Shelter Properties Limited, an Idaho General Partnership, McLennan and Bender, an Idaho General Partnership; and Western States Development Corporation, an Oregon Corporation, Defendants–Respondents.**

No. 22335.

Supreme Court of Idaho,
Boise, January 1997 Term.

Sept. 4, 1997.

Rehearing Denied Dec. 24, 1997.

Moffatt, Thomas, Barrett, Rock & Fields Chtd., Boise, for Plaintiffs–Appellants. Robert E. Bakes argued.

Cosho, Humphrey, Greener & Welsh, Boise, for Plaintiffs–Appellants. Fredric V. Shoemaker argued.

Hawley, Troxell, Ennis & Hawley, Boise, for Defendants–Respondents. Merlyn W. Clark argued.

SCHROEDER, Justice.

This is an appeal from a series of partial summary judgments dismissing plaintiffs/appellants' Complaint alleging breach of contract, breach of warranty, breach of fiduciary duties, fraud, unjust enrichment, and commercial impracticability.

## I.

### BACKGROUND AND PRIOR PROCEEDINGS

This case involves the purchase of seven rural housing projects ("the Projects") located throughout southern Idaho. The Projects are low-income housing units, financed through subsidized loan arrangements underwritten by the Farmers Home Administration ("FmHA").

The plaintiffs/appellants, Buyer, DBSI/TRI ("DBSI"), is a syndication of Idaho limited partnerships. The defendants/respondents, Seller, Bender and Associates ("Bender" or "Seller") consists of several general and limited partnership interests. Bender constructed the Projects. The defendant/re-

spondent Western States Development Corporation ("WSDC"), a corporation wholly owned and operated by Bender, managed the Projects. Prior to negotiations between DBSI and Bender, WSDC managed the units on behalf of Bender pursuant to a written management agreement executed in 1978. WSDC's compensation under this agreement was 9 1/2% of gross rents.

In the fall of 1984, DBSI and Bender began negotiations for the purchase and transfer of the Projects to DBSI. DBSI and Bender entered into two agreements to purchase all seven FmHA financed and regulated Projects, an Earnest Money Agreement dated May 31, 1984, and a Real Estate Sales Agreement dated October 12, 1984. The aggregate purchase price for the Projects was $8,303,000.00. DBSI paid $1,660,000.00 in cash and assumed existing first mortgages or deeds of trust indebtedness to the FmHA in the amount of $4,763,000.00. The balance of the purchase price was to be paid in one payment of $1,880,000.00, plus interest, on October 12, 1999. The Real Estate Agreement provided that "the equity payable to the Seller [at that time] will be provided from outside sources or from any authorized return on investment and not a planned sale of the projects."

A condition of the sale required DBSI to retain WSDC as the property manager for the Projects while "the deferred balance of the purchase price remains unpaid." DBSI and WSDC executed a Management Agreement on October 12, 1984. According to this Agreement WSDC was to be paid "seven percent (7%) of the approved equivalent market rents for all units occupied during the previous month plus seven percent (7%) of all miscellaneous income collected during the previous month or such lesser amount as FmHA shall approve ... provided that said fee shall not be less than the net fee currently being charged by Agent to manage said projects."

The parties also executed an Addendum to the Management Agreement on October 12, 1984, providing that, "[i]n the event FmHA does not approve the Agent's compensation ... then Agent shall have the sole and exclusive option to terminate said Agreement.... In the event Agent does not terminate ... the allocation and charging of overhead and expenses as provided [in the Management Agreement] is subject to FmHA's approval and the Agent shall not be paid compensation ... in excess of the amount approved by FmHA."

By the terms of the Real Estate Agreement and under federal law, the transfer of ownership of the Projects was subject to prior FmHA approval. Management fees payable under the Management Agreement and Addendum were also subject to FmHA approval, but the parties dispute whether that approval has a retroactive effect on fees paid prior to such approval. According to DBSI, Bender represented that FmHA approval of the Project transfer would be forthcoming within six (6) months from May 31, 1984, and that the Projects were being operated in compliance with FmHA regulations and the loan agreements so that such approvals could be timely obtained.[1] FmHA approval was delayed because the Real Estate Agreement allowed the Seller to retain a collateral interest in the Projects contrary to restrictions in the loan documents and FmHA regulations. Modification agreements to revise the collateral interest provisions were executed between the parties on September 12, 1985, and approved by the FmHA.

Bender's operations and the financial records of WSDC were also subject to approval by the FmHA. Approval of the financial records was delayed for approximately two (2) years while audited financial statements for 1984 and 1985 were prepared. The FmHA finally approved the transfer of Projects from Bender to DBSI in November of 1986. Between October 12, 1984, and December 31,

1. Count III of DBSI's Complaint alleged breach of oral contract and warranty with respect to the oral guaranty that FmHA approval would be obtained within six (6) months from May 31, 1984. The district court found that "[t]he negotiations which may have occurred during the earnest money stage were, by agreement of the parties, merged into the formal contracts which were signed in late October and early November of 1984. There is no reference in these agreements to any six month deadline for approval of the FmHA." DBSI does not appeal this ruling.

1986, WSDC managed the Projects for DBSI pursuant to the 1984 Management Agreement and Addendum. The 1984 Management Agreement never received FmHA approval, and DBSI claims that, in fact, the FmHA disapproved the Agreement.

On December 10, 1986, just prior to a final closing, DBSI and WSDC executed a new 1986 Management Agreement which was approved by the FmHA. Under the 1986 Management Agreement, WSDC was to be paid a monthly management fee of "$25.00 for each occupied unit." This rate was less than the 7% of market rents provided in the 1984 Management Agreement. In addition, the reimbursement for off-site administrative expenses was significantly curtailed. The final documents completing the sale were executed on December 30, 1986.

### A. Additional Facts

At the time of the initial negotiations between DBSI and Bender, the FmHA permitted two methods of accounting for the declining balance on the outstanding loan. These methods were referred to as the DIAS method and the PASS method. Under the DIAS method, the remaining obligation due in 1999 was based on a book balance. The district court explained that under this method, "a higher percentage of each installment is credited to principal than under the PASS method. Thus, the apparent book balance due appears to decline faster during the early years of the obligations under the DIAS method of accounting." Under the PASS method, the obligation was measured by the present value of remaining installments due at the effective interest rate after subtracting the subsidy. In other words, "the subsidy [is] credited against the dollar amount of the installments ... made." The district court determined that there is no difference in the dollar amount required to service the debt between the two methods. DBSI claims that the PASS method results in a lower representation of the net equity in the underlying mortgage and may impact adversely its ability to attract future investors and purchasers.[2]

In 1985 the FmHA announced that it would no longer follow the DIAS method of accounting but would account for the subsidized loans under the PASS method. 7 C.F.R. pt.1951, subpt. K (1985). This regulation became final for all transactions which closed after May 1, 1985, and was in place when the transfer on the Projects finally closed in December of 1986. DBSI claims that the change in accounting method impacts its ability to pay off the balance due, makes the Projects "economically unfeasible" and adversely impacts its ability to pay off the $1,880,000.00 due in 1999 because, after the change, "no one would buy or invest in [the Projects]."

In addition to changes in the FmHA amortization method, the Tax Reform Act of 1986 was passed while the sale of the Projects was pending. Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat.2085 (codified in scattered sections of 26 U.S.C.A. (West 1996)). That Act, approved on October 22, 1986, changes the tax consequences of real estate

---

**2.** In its First Amended Complaint DBSI states:

That change in FmHA regulations resulted in a material, unexpected and adverse change in the method of amortizing the mortgage balances to wit: the aggregate balance on the FmHA mortgages encumbering the Projects will be approximately $937,133.00 greater under PASS than they would have been under DIAS on October 12, 1999.

On appeal, DBSI does not dispute the district court's conclusion that:

The buyers concede that the accounting method utilized by the FmHA to account for the declining balance on the outstanding loans has no impact on the operation of the projects. It does not change in any respect the operational considerations of the revenues generated, the cash expenses incurred, or any other aspect whatsoever affecting the profitability or income potential. The buyers further concede that the accounting method utilized by the FmHA to account for the declining balance on the outstanding loans has no impact on the monetary obligations due from the buyers to the FmHA. It does not change the amount of monthly installments, the effect of the subsidy in terms of money, or the fact that the loan obligations will be fully amortized and retired upon the expiration date of the loans.

DBSI only maintains that:

[W]ithout the DIAS system of amortization ... which FmHA had touted to developers as justification for entering into the program, these projects were economically unfeasible *and no one would buy or invest in them.*

(emphasis added.)

investments. DBSI claims that a significant reason for purchasing the Projects consisted of the tax incentives it claims were eliminated by the Tax Reform Act.

## B. Prior Proceedings

DBSI seeks damages under the Real Estate Agreement and/or 1984 Management Agreement and Addendum and/or rescission or reformation of the Real Estate Agreement. Counts I and II of DBSI's first amended complaint allege commercial impracticability by virtue of the change in FmHA's amortization method and changes in the tax code and prays for rescission of the Real Estate Agreement. Count III alleges breach of warranty against Bender and WSDC resulting in damages in the amount of $937,133.00. Count IV alleges fraud and material misrepresentation against Bender for representing that the Projects were in compliance with FmHA regulations and that FmHA approval could be obtained in a six month period, allegedly resulting in damages in the amount of $200,000.00 [3] paid to WSDC in excess of a "lawful amount," $937,133.00 incurred as a result of closing after the FmHA amortization change, and $1,700,-000.00 incurred as a result of closing after the change in the tax code. Count V alleges breach of a written contract and a breach of fiduciary duty against WSDC. DBSI claims that management fees paid to WSDC were contractually subject to prior FmHA approval and that WSDC breached the contract by charging $129,944.00, exclusive of interest, in excess of what DBSI terms "the lawful reasonable allowable fees." DBSI also claims that WSDC owed it a fiduciary duty and that WSDC breached its duty by failing to prepare accurate books which caused a delay in FmHA approval, allegedly resulting in $937,-133.00 in damages as a consequence of the closing occurring after the change in FmHA's amortization method. Count VI alleges that WSDC was unjustly enriched by $129,944.00, exclusive of interest, DBSI paid

in excess of what the FmHA approved as management fees. Count VII alleges that representations and material omissions concerning contractual obligations, Bender's ability to obtain FmHA approval, and other representations regarding compliance with FmHA regulations fraudulently induced DBSI to enter into the Agreement allegedly resulting in $2,837,133.00 in damages. DBSI also prayed for rescission or reformation of the Agreement.

Initially the district court granted summary judgment in favor of the defendants on Counts I, II, part of III, VI, and part of V. Subsequently, the district court granted summary judgment in favor of the defendants on Counts III, IV, and VII and resolved Count V and addressed Count VI again in a Memorandum Decision. A final judgment and dismissal of the case was entered January 12, 1995. DBSI filed a motion to alter or amend judgment which was denied. The district court awarded Bender and WSDC $1,335.80 in costs and $105,667.37 in attorney fees.

## II.

## STANDARD OF REVIEW

■ A motion for summary judgment will be granted by a district court if "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." I.R.C.P. 56(c); *Mutual of Enumclaw Ins. Co. v. Roberts*, 128 Idaho 232, 234, 912 P.2d 119, 121 (1996). A review by this Court of a district court's ruling on a motion for summary judgment is the same as that required of the district court when it rules on the motion. *Mutual of Enumclaw*, 128 Idaho at 234, 912 P.2d at 121; *Curtis v. Firth*, 123 Idaho 598, 610, 850 P.2d 749, 761, *appeal after remand*, 125 Idaho 229, 869 P.2d 229 (1994). Accordingly, this Court will liberally construe the record in a light most favorable to the party

---

3. DBSI claims:

The amount of management fees which Western paid itself during the 27-month period from October, 1984, to December of 1986, was $129,944 more than the amount ultimately approved by FmHA.

DBSI claims it is entitled to this amount "plus interest." The $129,944.00 figure will be used throughout our discussion, although DBSI's First Amended Complaint states this figure is approximately $200,000.00 inclusive of interest.

opposing the motion, drawing all reasonable inferences in favor of that party. *Mutual of Enumclaw,* 128 Idaho at 234, 912 P.2d at 121 (citing *McCoy v. Lyons,* 120 Idaho 765, 769, 820 P.2d 360, 364 (1991)). If the record contains conflicting inferences or if reasonable minds might reach different conclusions, then the district court's order granting summary judgment must be reversed. *Id.*

## III.

### GENUINE ISSUES OF MATERIAL FACT EXIST REGARDING WHETHER WSDC SHOULD REIMBURSE DBSI FOR MANAGEMENT FEES PAID BETWEEN OCTOBER 12, 1984, AND DECEMBER OF 1986 IN EXCESS OF THAT APPROVED BY FMHA.

#### A. The Contract Terms, Express and Implied, Are Reasonably Susceptible To Different Interpretations.

At issue is whether WSDC should be required to reimburse DBSI for the difference in management fees and off-site expenses received between 1984 and 1986 in excess of the amount provided by the 1986 Management Agreement and approved by the FmHA. According to DBSI that amount is approximately $129,944.00, exclusive of interest. DBSI claims reimbursement upon the theory of breach of written contract and unjust enrichment.

The district court granted summary judgment against DBSI on that portion of Count V dealing with breach of a written contract, reasoning that FmHA approval was not a condition precedent to DBSI's obligation to pay the contracted for management fee amount and that "[f]rom the plain language of the addendum, and from the conduct of the parties, it is apparent that the management agreement was merely subject to the disapproval of FmHA." The district court also reasoned that if FmHA approval was a condition precedent, DBSI had waived that condition.

DBSI maintains that FmHA approval was unambiguously a condition precedent to its performance, (1) according to the express terms of the Real Estate Agreement, the Management Agreement, and the Addendum, and (2) because FmHA approval of management fees is contemplated by the federal regulations in effect on October 12, 1984, and that these regulations became an implicit term in the Agreements. DBSI argues that the record shows the 1984 Management Agreement was disapproved by the FmHA.[4]

WSDC maintains that there is no contractual basis to seek reimbursement of management fees because there is no term requiring prior FmHA approval in the relevant Agreements, nor are the federal regulations in effect on October 12, 1984, explicit with respect to prior approval or retroactive application of its determination of reasonable fees. Furthermore, WSDC argues that the Addendum to the 1984 Management Agreement unambiguously provides for compensation according to the contract provisions until modified. WSDC disputes that the 1984 fee arrangement was ever disapproved by the FmHA.

The management fee dispute involves the question of whether the terms of the contract are unambiguous and may be interpreted as a matter of law or are ambiguous and, therefore, a question for the factfinder to resolve based upon the intent of the parties. If the terms of a contract are clear and unambiguous, the interpretation of the contract's meaning is a question of law. *City of Chubbuck v. City of Pocatello,* 127 Idaho 198, 201, 899 P.2d 411, 414 (1995); *Ada County Assessor v. Taylor,* 124 Idaho 550, 553, 861 P.2d 1215, 1218 (1993). If the terms of a contract are ambiguous, the interpretation of that contract's meaning is a question of fact. *City of Chubbuck,* 127 Idaho at 201, 899 P.2d at 414; *Bondy v. Levy,* 121 Idaho 993, 997, 829 P.2d 1342, 1346 (1992). The initial inquiry into whether a contract is ambiguous presents a legal question over which this Court exercises free review. *City of Chubbuck,* 127 Idaho at 201, 899 P.2d at 414.

---

4. In its December 1994 Memorandum Decision, the district court determined that the "parties concede that the FmHA never expressly disapproved the compensation arrangements of the 1984 management agreements." DBSI claims it made no such concession.

In order to determine whether the contract is ambiguous, this Court must determine whether the terms of that contract are reasonably susceptible to conflicting interpretations. *Id.*; *Doyle v. Ortega,* 125 Idaho 458, 461–62, 872 P.2d 721, 724–25 (1994).

■ The district court concluded that DBSI did not have a contractual basis within the 1984 Management Agreement or its Addendum to claim reimbursement. It based its conclusion largely on the language in the Addendum and the determination that by executing the Addendum, the parties dealt with the issue of what management fee payments were enforceable at what time. The Addendum states the following:

This Addendum dated October 12, 1984, amends the Housing Management Agreement . . . and is a material condition and term of said agreement.

IT IS AGREED:

1. *In the event FmHA does not approve the Agent's compensation as provided in Paragraph 23 or the allocation of costs and overhead as provided in Paragraph 16, then the Agent shall have the sole and exclusive option to terminate said Agreement.* This termination shall not affect any other term, covenant or condition of the Real Estate Agreement of even date and, specifically, without limitation shall not be grounds for acceleration of the deferred contract balance of the purchase price.

2. In the event Agent does not terminate under Paragraph 1 above, the allocation and charging of overhead and expenses as provided in Paragraph 16 of said Agreement is subject to FmHA's approval *and the Agent shall not be paid compensation under Paragraph 23 of said Agreement in excess of the amount approved by FmHA.* (emphasis added).

The Addendum may be read to provide that WSDC would be paid the FmHA approved rate only after disapproval of its 1984 Management Agreement but would be entitled to collect fees as provided in the Agreement until such disapproval. The Addendum may also be read to mean that WSDC is not to be paid in excess of the amount approved by FmHA in any event. The terms of the Agreement and Addendum are reasonably subject to different interpretations.

Terms regarding FmHA approval in the Real Estate Agreement and Management Agreement are non-explicit. There is no express term requiring prior FmHA approval or invalidating WSDC's compensation if the FmHA did not ultimately approve the compensation formula. The Agreements are ambiguous on this point.

DBSI also argues that the federal regulations in effect when the 1984 Management Agreement was entered into provide for FmHA approval of management compensation and that such requirements became an implicit term in the contract. This Court has held that the extant law is written into and made a part of every written contract unless some contrary intent is disclosed. *Robinson v. Joint Sch. Dist. No. 150,* 100 Idaho 263, 265, 596 P.2d 436, 438 (1979). The federal regulations related to the management of FmHA financed projects do contemplate the eventual necessity of FmHA approval of management agreements and fees, but those regulations and accompanying exhibits do not explicitly invalidate contracts between owners and management agents prior to approval by the FmHA, nor do they make FmHA determination of reasonable fees retroactive.

In the 1986 Management Agreement the parties took care to incorporate provisions set forth as exemplary at 7 C.F.R. pt.1930, subpt. C, Exh.# B–3 (1984) limiting effectiveness of the contract until FmHA approval was obtained, including a provision that "[t]his agreement is NOT in full force and effect unless and until concurred by FmHA." *See* 7 C.F.R. pt.1930, subpt. C, Exh. # B–3 (1984). The parties also included a provision which states:

B. Term of Agreement. This agreement shall be in effect for a period of two years, beginning on the 10th day of December, 1986, subject, however, to the following conditions: 1. *This Agreement will not be binding upon the Principal Parties until approved by FmHA.*

*See id.* (emphasis added).

No similar provisions are included in the 1984 Management Agreement. Rather, the

1984 Management Agreement provides: "This agreement will be binding upon the Principal Parties subject to subsequent approval or modification by FmHA."[5] Although extant law becomes a term of the contract absent intent to the contrary, there is no regulation related to the compensation of management agents which invalidates retroactively a contract term between the parties. Consequently, the federal regulations do not resolve the question.

■ In sum, the contract terms are ambiguous as to whether FmHA approval was a condition precedent to DBSI's performance. The case is remanded to the district court for a factual determination of whether the parties intended WSDC to be paid only that amount approved by the FmHA retroactively.

## B. Genuine Issues of Material Fact Exist Regarding Whether The 1984 Management Agreement was "Disapproved" by FmHA.

■ The district court determined:

Both parties conceded that the FmHA never expressly disapproved the compensation arrangements of the 1984 management agreement.

. . . .

Further, because FmHA did not disapprove of the management fees charged by Western States from 1984 to 1986, there is no contractual basis ... to claim reimbursement.

The record reveals that DBSI did not concede that the FmHA did not disapprove the compensation agreement. The unmodified 1984 Management Agreement was not approved by the FmHA and DBSI argues that, in fact, the FmHA disapproved the Agreement. The Agreement was not submitted to the FmHA for approval until May 1, 1985. The first indication of FmHA disapproval of the 1984 Agreement is found in a letter dated September 9, 1986, from the FmHA to the comptroller at WSDC. In relevant part that letter states:

This is in response to your letter of July 23, 1986. In our Letter of Conditions, we required that certain objectionable paragraphs be removed from the proposed Management Agreement between your firm and the Tomblinson Group. We also required that language from Farmers Home Administration (FmHA) Instruction 1930–C, Exhibit B–3, VI, B, 4, which gives the Farmers Home Administration State Director the right to terminate the agreement [sic].

The record also contains a letter dated October 7, 1986, to Bender from Fred Marker of the FmHA which states in relevant part:

This will remind you that the above referenced loan is in default due to unauthorized sale of the project. You were notified of this default situation by our letter of January 17, 1985. Since that time, we have worked patiently with you and the new owners in an attempt to accomplish a transfer of the Farmers Home Administration (FHA) loan in a manner which would cure the default. After numerous requests by FmHA, you have yet to furnish certain items of information needed prior to transfer of the loan. These items are as follows:

. . . .

3. A Management Agreement is to be modified to be in compliance with FmHA Instructions 1930–C, Exhibit B–2.

. . . .

In summation, we are requesting that you furnish the following within thirty days from the date of this letter:

. . . .

4. The Management Agreement modification to be approved by FmHA.

Construing the facts in favor of DBSI, a genuine issue of material fact exists as to whether this correspondence is a disapproval. The most that can be said about these letters is that the FmHA potentially disapproved of the 1984 Management Agreement. The issue is remanded for a determination of whether FmHA did disapprove of the fees provided for in the 1984 Management Agreement.

---

**5.** WSDC claims this term unambiguously makes its case. We believe this provision is ambiguous when read with other provisions seeming to require FmHA approval.

### C. Resolution of DBSI's Claim For Unjust Enrichment Will Not Be Reviewed At This Time.

■ DBSI claims that WSDC was unjustly enriched by $129,944.00, exclusive of interest, for fees paid in excess of those approved by FmHA. The district court determined that since the terms of the 1984 Management Agreement expressly determined payment of management fees, summary judgment was properly granted against DBSI on this claim. DBSI argues that it was error for the district court to dismiss the claim for unjust enrichment on the basis that there was "an enforceable express contract covering the same subject matter," and then to later dismiss the contract claim without reinstating the claim for unjust enrichment. DBSI maintains that if it loses on its contract theory it should be allowed to attempt recovery under the equitable theory of unjust enrichment.

In *Wolford v. Tankersley*, 107 Idaho 1062, 695 P.2d 1201 (1985), this Court stated the following:

> [E]ven though an agreement exists, unjust enrichment may be imposed. *Hixon v. Allphin*, 76 Idaho 327, 281 P.2d 1042 (1955). The existence of an express agreement does not in and of itself signify that an action for unjust enrichment cannot be brought. Rather, only when the express agreement is found to be enforceable is a court precluded from applying the equitable doctrine of unjust enrichment in contravention of the express contract.

*Id.* at 1064, 695 P.2d at 1203.

Resolution of DBSI's claim for unjust enrichment will await the district court's determination of the terms of the contract on remand.

### IV.

### CHANGES IN FMHA'S ACCOUNTING AND CHANGES IN THE TAX CODE DO NOT RENDER THE TRANSACTION COMMERCIALLY IMPRACTICABLE.

■ Count I of DBSI's First Amended Complaint alleges that the change in FmHA's accounting system from DIAS to PASS increased the aggregate amount due under the mortgage by $937,133.00 and this increase renders its performance commercially impractical.[6] DBSI notified Bender of its inability to gain an exemption and requested a reduction in the amounts otherwise due by $937,133.00. Bender refused. DBSI requested the district court to rescind or reform the contract by reducing its performance by $937,133.00.

Count II of DBSI's First Amended Complaint alleges that changes in the tax code, in combination with changes in the FmHA amortization method, limited DBSI's ability to sell or refinance the Projects and renders its performance commercially impractical. DBSI claims that it was a basic assumption at the time of contracting that it would be able to sell the Projects to a third party for a price equal to or greater than the aggregate amount it paid. Changes in the tax laws regarding tax benefits associated with owning and operating the Projects, including accelerated depreciation schedules, capital gain allowances and introduction of passive loss restrictions, eliminated this potential. DBSI requested the district court to reform the contract, reducing its performance by $1,700,000.

In *City of Boise v. Bench Sewer Dist.*, 116 Idaho 25, 773 P.2d 642 (1989), this Court stated the following:

> [A] contract embodies the choice of a planned future over the risk that subsequent events may cause the plan to become undesirable for one of the parties. The law generally enforces such choices because, even though a particular agreement may prove to be improvident, contracts as a whole benefit society by contributing to the rational ordering of human affairs. Equity will not intervene unless a contract is unlawful, violates public policy, or produces unconscionable harm.... It is not sufficient that the contract produces

---

**6.** DBSI sought administrative review for an exemption from the PASS system but was unsuccessful.

a suboptimal or inconvenient result, viewed in hindsight.

*Id.* at 30, 773 P.2d at 647.

██ The district court concluded that the change from the DIAS method to the PASS method did not excuse DBSI's performance for reason of commercial impracticability because there is no difference in the obligation due to the FmHA in 1999. Therefore, DBSI's ability to perform was not impacted by the change. Whether the doctrine of impracticability applies in a given case is a mixed question of law and fact over which we exercise free review. *Id.* at 29, 773 P.2d at 647. The district court correctly resolved DBSI's claim of commercial impracticability as it relates to the change in the FmHA amortization method, especially in light of the provision in the Real Estate Agreement which specifically provides:

> (b) the equity payable to the Seller will be provided from outside sources or from any authorized return on investment and not a planned sale of the projects.

This provision makes it clear that, even if the difference in the amortization method affects DBSI's net equity in the mortgages and makes it more difficult to attract a buyer for the Projects, the fact that no buyer can be found was clearly anticipated by the parties. As the district court correctly noted, "the contracts and the FmHA assumption documents specifically provide that payment of the deferred balances due seller shall come from outside resources and shall *not* depend upon sale or refinance. The conclusion is inescapable that under any construction of the facts, the continuation of the DIAS method of accounting was not a basic assumption of the contract, and application of this theory now to excuse performance is unavailable in any event."

██ The district court's reasoning with respect to the changes in tax law is similarly persuasive. The district judge determined:

> I cannot accept the premise that this tax legislation was unforeseeable. President Reagan telegraphed the coming of a major tax overhaul beginning with his election in 1980. The Tax Reform Act itself was under consideration by Congress for months prior to its enactment. The syndicators of

the plaintiff partnerships included detailed warnings in the materials submitted to potential investors regarding the uncertainty of the tax laws, and the risks associated with any change in the tax structure.

> It is significant that the earnest money agreements contained specific escape clauses which permitted the buyers to withdraw in the event of any change in the tax laws, while the formal purchase contracts contained no such provisions.

> . . . .

> The 1986 Tax Reform Act has no affect [sic] on the cash revenues generated, the cash expenses incurred, the loan installments payable or the potential cash flow to be derived from the operation of the projects. The Act does not prohibit payment of the deferred balances, nor can Buyers assert that they are unable to comply with the Act.

The parties anticipated changes in the tax law as evidenced by the provisions in the Earnest Money Agreement allocating risk in the event of a tax law change. The fact that later agreements are devoid of this provision does not negate the fact that they clearly anticipated that the tax law might change during or after their negotiations were complete. The district court correctly determined, as a matter of law, that "[t]he buyers protected themselves against changes in the tax laws during the interim between the earnest money agreements and the execution of the final contracts. When the final contracts were executed in the fall of 1984, the risk of future tax law changes fell upon the buyers."

## V.

### DBSI'S FRAUD AND MISREPRESENTATION CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS.

██ Count IV of DBSI's First Amended Complaint alleges that Bender made numerous promises, representations and warranties regarding the management of the Projects for the period prior to execution of the Earnest Money Agreements which were untrue, false, and constituted misrepresentations. In Count VII, DBSI alleges that Bender and

WSDC made fraudulent statements prior to the execution of the 1984 Agreements which induced DBSI to enter into the Agreements. Both Count IV (fraudulent misrepresentation) and Count VI (fraud in the inducement) assert that DBSI suffered no less than $2,973,133.00 in damages as a result of these alleged frauds. The district court determined that the statute of limitations for fraud is governed by I.C. § 5–218 and provides that a cause of action based on fraud must be brought within three years from the later occurrence of the fraud or the time of discovery of the facts sufficient to put the aggrieved party on notice of the fraud. I.C. § 5–218. The district court determined that DBSI's Complaint was filed on May 11, 1990, more than three years after "the defendants had full knowledge of all of the parts of any claim for fraud, fraudulent misrepresentation or fraud in the inducement by December 30, 1986, when they finally and irrevocably accepted the assumption agreements with the FmHA."

DBSI argues that, because an element of its cause of action for fraudulent misrepresentation requires it to prove the speaker's knowledge of falsity, the statute of limitations is tolled until such a time as it could demonstrate that element. DBSI maintains that the only information it had on December 30, 1986, was that the representations were false. It maintains that, at that time, it was still unable to show the speaker's knowledge of falsity of these representations until the acquisition of four pieces of evidence during the discovery process. This evidence included: (1) a letter dated June 20, 1984, from WSDC in which it falsely stated that no management agreement existed between it and Bender; (2) deposition testimony by the WSDC comptroller admitting that he knew that the representations made to the independent CPA auditors in 1984 were inaccurate and that the Projects were not in compliance with FmHA regulations; (3) deposition testimony by the WSDC Comptroller that Bender was aware that his books and records were not accurate and did not comply with the FmHA regulations; and (4) a letter from FmHA to WSDC regarding its non-compliance with FmHA regulations

which DBSI claims should have been, but was not, disclosed to DBSI.

Section 5–218 of the Idaho Code provides in relevant part:

**5–218 Statutory liabilities, trespass, trover, replevin, and fraud.**

— Within three (3) years:

. . . .

4. An action for relief on the ground of fraud or mistake. The cause of action in such case not to be deemed to have accrued until the discovery, by the aggrieved party, of the facts constituting the fraud or mistake.

I.C. § 5–218–(4).

▮▮▮▮▮ Where discovery of a cause of action for fraud commences the statute of limitations, the date of discovery is a fact question for the jury unless there is no evidence creating a question of fact. *Jones v. Runft, Leroy, Coffin & Matthews,* 125 Idaho 607, 615, 873 P.2d 861, 869 (1994); *McCoy v. Lyons,* 120 Idaho 765, 773, 820 P.2d 360, 368 (1991). Actual knowledge of the fraud can be inferred if the aggrieved party could have discovered the fraud by reasonable diligence, although the Court will hesitate to infer such knowledge. *McCoy,* 120 Idaho at 773, 820 P.2d at 368.

DBSI could have stated a cause of action for fraud using circumstantial evidence to show intent to defraud. Other jurisdictions have held that although actual fraud must be shown, its existence may be inferred from the presence of certain indicia of fraud or "badges of fraud." Once the plaintiff establishes by circumstantial evidence an inference that the defendant harbored actual intent to defraud, the burden of coming forward with rebuttal evidence shifts to the defendant. *See Sportsco Enter. v. Morris,* 112 Nev. 625, 917 P.2d 934, 938 (1996); *Territorial Sav. & Loan Ass'n v. Baird,* 781 P.2d 452, 462 n. 18 (Utah.Ct.App.1989). *See also* 37 AM JUR.2D *Fraud and Deceit* §§ 466, 477 (1986).

The district court noted that the auditors gave detailed information to DBSI and that this information was sufficient to put anyone on notice of each of the elements of DBSI's cause of action. The audit revealed that the

books and records were incorrect, that there were problems with the reserve account balances, that Bender had commingled funds between Projects, that the management fees appeared excessive and that the FmHA had warned the defendants about improper management. In addition the district court noted:

From the beginning of the audit, Touche Ross informed the buyers that the audits were being hindered by defendant Western States Development Corporation's (WSDC) delay in providing requested information and the unsatisfactory character of the financial records.

These indications prior to the 1986 closing threw sufficient suspicion on the transaction that DBSI should have called for an explanation. While they do not in and of themselves constitute fraud, they do show the existence of fraud such that DBSI could have shown, through circumstantial evidence, intent to defraud. DBSI discovered the facts constituting fraud at least by December of 1986. The district court did not err in holding DBSI's claim for fraud, filed in May of 1990, was time barred pursuant to I.C. § 5–218.

## VI.

### DBSI'S BREACH OF FIDUCIARY DUTY CLAIM WAS BARRED BY THE STATUTE OF LIMITATIONS.

The gravamen of DBSI's claim of breach of fiduciary duty contained in Count V of its First Amended Complaint is that by failing to manage and maintain books, accounts and records of the projects in a reasonable manner consistent with FmHA regulations, WSDC breached its fiduciary duty and caused delays in the financial audits and FmHA approval. DBSI claimed it was damaged in the amount of $937,133.00 as a consequence of the transfers occurring after the effective date of the FmHA's change in the amortization method. In addition, DBSI claims that these alleged breaches resulted in approximately $129,944.00, exclusive of interest, in excessive management fees paid by DBSI to WSDC.

The district court determined that any breach in fiduciary duty would have had to:

have arisen during or prior to the completion of the Touche Ross audit, which was completed and delivered on April 8, 1986. By this time all of the deficiencies and defects claimed by the plaintiff were fully revealed. Plaintiff's original complaint in this matter was filed May 11, 1990, more than four years later. The claim is barred by the statute of limitations included in either I.C. § 5–217 or 5–224.

The district court went on to say, "Under the most favorable interpretation of the facts, the limitations period had to have started no later than April 8, 1986, the date the 1984 financial audits were finalized by Touche Ross ... which fully disclosed the accounting and compliance problems."

▇▇▇ The statute of limitations for breach of fiduciary duty begins to run "when the beneficiary knows or should by the use of ordinary care have known of a breach or a repudiation of the trust by the trustee." *First Bank & Trust of Idaho v. Jones,* 111 Idaho 481, 485, 725 P.2d 186, 190 (Ct.App. 1986) (quoting G.G. BOGERT AND G.T. BOGERT, HANDBOOK OF THE LAW OF TRUSTS § 170, at 642 (5th ed.1973)).

▇▇▇ DBSI reasons that, because WSDC had exclusive possession of the Project assets, a trust was created such that the statute of limitations for breach of fiduciary duty is tolled until the trust is repudiated and such conduct is unequivocally made known to the beneficiary, as in *Harbaugh v. Myron Harbaugh Motor, Inc.,* 100 Idaho 295, 597 P.2d 18 (1979). This argument is not persuasive. WSDC owed DBSI fiduciary duties as its agent not as its trustee. The fact that WSDC may or may not have exclusively managed the assets of the Projects on behalf of DBSI does not turn an agency relationship into a trust. A trust creates a fiduciary relationship in which the trustee is the holder of legal title to the property subject to the beneficial interest of the beneficiary. *Estate of Hull v. Williams,* 126 Idaho 437, 443, 885 P.2d 1153, 1159 (Ct.App.1994) (citing 1 GEORGE GLEASON BOGERT, THE LAW OF TRUSTS AND TRUSTEES § 1 (revised 2d ed.1984); RESTATEMENT (SECOND) OF TRUSTS § 2 (1957)). The essential characteristics of

a trust relationship are separation of the legal title from the beneficial interest and the existence of fiduciary duties. *Id.* (citing *In re Eggan's Estate,* 86 Idaho 328, 337, 386 P.2d 563, 568 (1963)). Although the duties attendant to an agency are frequently compared to those involved in a trust, *see* 3 AM JUR 2D *Agency* § 210 (1986), an agency is not a trust. RESTATEMENT (SECOND) TRUSTS § 8 (1957). In this case, WSDC did not hold title to the property for the beneficial interest of DBSI.

In addition, this Court has said that the intent of the depositor to create a trust will prevail. *Vaughan v. First Fed.,* 85 Idaho 266, 276, 378 P.2d 820, 825 (1963). The Agreements refer to WSDC as an "agent" not a "trustee" and indicate, although not conclusively, that even DBSI did not intend to create a trust in allowing WSDC exclusive management.

The district court correctly determined that the statute of limitations started to run when DBSI knew or should have known of a breach rather than being tolled until the repudiation of the fiduciary relationship.

## VII.

### OTHER BREACH OF CONTRACT CLAIMS

DBSI argues that the district court erred in "lumping" all of its claims for breach of contract in with its breach of fiduciary duty claims and applying the four-year statute of limitations in I.C. § 5–224 to all. DBSI claims that the five-year statute of limitations in I.C. § 5–216 should have been applied to at least its contract claims. DBSI claims it made breach of written contract claims under Counts III, IV and V of its First Amended Complaint.

Count IV sounds in fraud, not contract, and the district court properly determined that I.C. § 5–218 applies to this claim. As this Court said in *Barnett v. Aetna Life Ins. Co.,* 99 Idaho 246, 580 P.2d 849 (1978):

> The substance, not the form, of the action controls and determines the applicable Statute of Limitations. *Stewart v. Hood Corp.,* 95 Idaho 198, 506 P.2d 95 (1973); *Thomas v. Gordon,* 68 Idaho 254, 192 P.2d 856 (1948).
>
> "The test ... is not whether the fraud or mistake occurred in a contract or independently of contract, but the test rather is whether the action seeks relief from or on account of fraud or mistake." *Hillock v. Idaho Title and Trust Co.,* 22 Idaho 440, 450, 126 P. 612, 616 (1912).

*Id.* at 247, 580 P.2d at 850.

Count III alleges breach of an oral representation that FmHA approval would be obtained within six (6) months of May 31, 1984. The district court determined that oral representations were superseded by the written Agreements which made no mention of the six-month time period to acquire FmHA approval. DBSI does not appeal from this ruling. Count III also alleges breach of written promises by Bender that the Projects were being operated in compliance with the FmHA regulations and other Agreements.

Count V alleges breach of a written contract by WSDC in "failing to prepare ... books, accounts and records ... in a reasonable manner and ... consistent with FmHA regulations." DBSI claims it was damaged because these failures created a delay in obtaining FmHA approval.

There are claims for breach of contract in Counts III and V which were not specifically addressed by the district court. Nevertheless, the changes in the FmHA amortization method do not impact DBSI's performance of the contract, and changes in the tax law were anticipated by the parties and DBSI has identified no damages which resulted from these alleged breaches. The district court did not err by granting summary judgment against DBSI on these contract claims.

DBSI also claims that it demonstrated that WSDC paid itself $6,185.00, exclusive of interest, in excess of even the management fees authorized by the 1984 Management Agreement. This portion of the decision is remanded for a determination of whether WSDC breached the terms of the 1984 Management Agreement.

## VIII.

## CONCLUSION

The case is remanded for proceedings consistent with this opinion. Each party has prevailed in part. No costs or attorney fees are awarded.

McDEVITT *, J., and GUTIERREZ, J. Pro Tem., concur.

JOHNSON, Justice, concurring in part and dissenting in part.

I concur with all of the Court's opinion except Part V (DBSI's Fraud and Misrepresentation Claims Are Barred by the Statute of Limitations), from which I respectfully dissent.

The Court premises its decision barring DBSI's fraud claim under the statute of limitations on the basis that DBSI could have made a claim for fraud "utilizing circumstantial evidence to show intent to defraud." The real issue is whether there is a genuine issue of fact concerning when DBSI reasonably should have discovered the facts that constitute fraud. In my view, there clearly is.

In *McCoy v. Lyons*, 120 Idaho 765, 820 P.2d 360 (1991), the Court stated that "our cases have consistently held that where discovery of a cause of action commences the statute of limitations the date of discovery is a fact question for the jury unless there is no evidence creating a question of fact." *Id.* at 774, 820 P.2d at 369. In *McCoy*, the Court pointed out the importance of this principle in summary judgment cases "where all reasonable inferences are resolved in favor of the party opposing summary judgment." *Id.* at 774, 820 P.2d at 371.

The cases cited by the Court are clearly not on point. *Sportsco Enterprises v. Morris*, 112 Nev. 625, 917 P.2d 934 (1996) is not a summary judgment case. *Territorial Savings & Loan Ass'n v. Baird*, 781 P.2d 452 (Utah.Ct.App.1989), is a summary judgment case but did not deal with the statute of limitations or discovery of fraud. Instead, the Utah Court of Appeals overturned a summary judgment dismissing a claim for fraud-

ulent conveyance, concluding that there were genuine issues of material fact concerning proof of fraud. *Id.* at 462–63. Neither of these cases, nor the rationale stated in them, undermines the well-established standards by which this Court considers whether there is a genuine issue of material fact concerning the discovery of facts that constitute fraud.

Although circumstantial evidence of Bender's knowledge of the falsity of his representations might be a basis for denying a motion to dismiss DBSI's claim on its merits, it does not establish the lack of any genuine issue of material fact concerning when DBSI reasonably should have discovered Bender's knowledge of the falsity of his statements. Therefore, the burden never shifted to DBSI to come forward with evidence creating a genuine issue of material fact. *Smith v. Meridian Joint Sch. Dist. No. 2*, 128 Idaho 714, 718–19, 918 P.2d 583, 587–88 (1996).

Even if the burden had shifted, however, evidence presented by DBSI, including the affidavit of its president, Douglas L. Swenson, created a genuine issue of material fact concerning when DBSI should have discovered the fact of Bender's knowledge. Among other things, DBSI relied on independent auditors' certification of the accuracy of Bender's financial statements.

I would vacate the trial court's summary judgment dismissing DBSI's fraud and misrepresentation claims.

GRANATA, Judge Pro Tem., concurring in part and dissenting in part.

I concur with all sections of the Court's opinion, except for Section IV, entitled "Changes in FmHA's Accounting and Changes in the Tax Code Do Not Render the Transaction Commercially Impracticable." My conclusion is that there yet exist genuine issues of material fact as to this issue, based upon a review of the affidavit of Douglas Swenson, his supplemental affidavit, and the affidavit of Mr. Arnell, Bender's comptroller. Therefore, I would reverse the district court

---

* Justice McDevitt participated in this decision pri-     or to his resignation.

as to this issue and remand it for a factual determination.