773 P.2d 642

The CITY OF BOISE,
Plaintiff–Respondent–Cross–Appellant,

v.

The BENCH SEWER DISTRICT,
Defendant–Appellant–Cross–Respondent.

No. 16787.

Supreme Court of Idaho.

March 30, 1989.

Rehearing Denied June 7, 1989.

Gass & Gass, and Imhoff & Lynch, Boise, for plaintiff-respondent-cross-appellant. David R. Lombardi, argued.

Givens, McDevitt, Pursley, Webb & Buser, Boise, for defendant-appellant-cross-respondent. Charles F. McDevitt, argued.

1988 OPINION NO. 122, ISSUED DECEMBER 28, 1988, IS HEREBY WITHDRAWN AND THIS OPINION IS SUBSTITUTED THEREFOR.

Before BAKES, Acting C.J.,
BISTLINE and HUNTLEY, JJ., and
McFADDEN and BURNETT, JJ. Pro
Tem.

PER CURIAM.

This is a contract case. It illustrates the truism that when two parties enter a contract, they chart a mutual course of action, implicitly choosing the security of a planned future over the risk that events may cause the plan to become undesirable for one party or the other. Today we must decide whether such a contract between the City of Boise and the Bench Sewer District should be enforced despite subsequent events affecting the economics of sewage treatment. We hold that it should.

■ The case comes to us on appeal from a judgment declaring the contract no longer enforceable as written. The trial judge reformed the contract, directing the City to continue treating sewage as originally agreed, but ordering the District to pay more for this service. The District appealed,[1] contending that the contract is still valid and that any increased charges should be limited to those authorized by the contract itself. For reasons explained below, we agree with this contention. Accordingly, the judgment is vacated and the case is remanded for a determination of proper charges under the contract.

I

The facts framing this controversy are complex, requiring a detailed exposition. Within the present boundaries of the City of Boise, a tract of land commonly called "the Bench" occupies a plateau above the valley floor. During the 1950s, when most of this tract was outside the City, the Bench population reached such a density that sewage in septic tanks and drain fields began to foul the groundwater. An engineering study disclosed that a modern sewage collection and treatment system was necessary to prevent further contamination. Although the City possessed such a system, it was not economically feasible to extend the City's lines into that limited portion of the Bench which lay within the municipal boundaries. Neither was it possible, for reasons beyond the scope of this discussion, for the City to annex and to serve the entire Bench area. Accordingly, in 1958 a new entity, the Bench Sewer District, was formed pursuant to Title 42, Chapter 32, Idaho Code.

In 1959 the District and the City entered a fifty-year contract providing for the City to treat sewage collected by the District. The contract recited that the sewage would be treated at the City's plant, located on Lander Street near the Boise River. The District agreed to defray part of an existing bonded indebtedness on the plant, to provide equipment for additional plant capacity, and to pay part of the City's actual operating costs at the plant. The contract contained no language explicitly requiring the District to pay for any subsequent expansion of the City's sewage treatment system.

The contract was amended in 1964. The parties agreed that the District's responsibility for annual operating costs would be computed annually. The parties would "determine the costs of the operation and maintenance" of the plant, as well as the gallonage of sewage treated, each fiscal year. The "pro rata charge per million gallons" would be assessed to the District on sewage delivered for treatment at Lander Street during the next year. The allocable costs were limited to those "actually incurred in the operation of said sewage treatment plant."

The amended contract also provided for apportioning the costs of "unusual repairs or replacements made during the preceding year." If the City and the District "agree[d] to the reasonableness and necessity of such expenditures," the amounts would be allocated—like the annual operating expenses—"upon the pro rata basis that the gallonage of sewage treated in the City treatment plant for the District bears

---

1. The City also filed a cross-appeal, apparently intending to challenge the trial court's failure to award attorney fees. However, that issue has not been briefed or argued. Accordingly, we deem the cross-appeal to be abandoned.

to the total amount of gallonage treated during [the preceding] year."

After the 1964 amendment, the City billed the District for each year's sewage treatment based on the previous fiscal year's costs incurred with respect to the operation at Lander Street. These costs were deemed to include all labor and materials, plus a charge for administration. As a proxy for actual administrative expenses, the City charged half the salaries of two senior administrators managing the City's sewage system. Thus, as the City's sewage treatment costs changed from one year to another, so did the District's costs, albeit not in precise correlation.

The parties amended the contract a second time in 1967. On this occasion they noted that the District had not yet fully performed its original obligation to supply equipment for additional capacity at the Lander Street plant. The parties agreed that the District would complete its performance by furnishing several enumerated items. These items later were supplied, leaving the District with a future obligation only to pay its share of annual operating expenses and any "unusual repairs or replacements." Nevertheless, as we will explain more fully later, the District contributed to an acquisition of additional equipment at Lander Street in 1971.

In the early 1970s, two events altered the economics of operating the Lander Street plant. First, there was an increase in sewage delivered to the plant. The increase was attributable not so much to the Bench

as to other parts of the Boise metropolitan area.[2] Second, state and federal standards governing sewage treatment became more rigorous, particularly after Congress enacted an amendment to the federal Water Pollution Control Act in 1972. As a result of these events, the City opened another facility, the West Boise treatment plant, "downstream" along the Boise River in 1976. For reasons that need not be expounded here, sewage treatment at the West Boise plant was more expensive than at Lander Street. Consequently, there was an increase in the average cost per gallon of treating sewage in the entire Boise sewer system.[3] At the same time, however, the West Boise plant alleviated growing pressure on the Lander Street plant, thereby lessening the need for costly expansion of capacity at the older facility.[4] Thus, as a result of an interplay between urban population growth and increasingly strict pollution control standards, there was a divergence between the overall cost of treating sewage in the entire system and the cost of treatment at Lander Street alone.

From 1976 to 1979, the City continued to bill the District only for its share of costs attributable to the operation at Lander Street, as the City had done since the inception of the contract. In 1979, however, the City attempted to bill the District for operating costs calculated under an "Industrial Cost Recovery and User Charge System" developed by the City when the West Boise plant opened. This "user charge" scheme

2. As noted by the district judge, the "general outline" of the District's geographical boundaries has remained the same since the District was created in 1959. There has been only modest growth in sewage collection on the Bench since the late 1960s. For example, in the fiscal year ending May 31, 1970, the District collected and delivered for treatment 947 million gallons (averaging approximately 2.59 million gallons per day). In the fiscal year ending May 31, 1984, the District collected and delivered 1,004 million gallons (averaging approximately 2.75 million gallons per day).

3. In addition to costs incurred at the Lander Street and West Boise plants, the City's treatment costs also have included the expense of operating a third, smaller facility at Gowen Field, adjacent to the municipal airport. This

facility, far removed from the Boise River, is not required to meet the treatment standards applicable to the West Boise and Lander Street plants. Effluent at Gowen Field is treated in a lagoon system and then is discharged upon the ground's surface. Consequently, the Gowen Field facility does not have a substantial impact on the economic issues presented in this case.

4. The district court made no specific finding as to the Lander Street plant's capacity. Expert opinions and estimates varied from 10 to 15 million gallons per day. When the United States Environmental Protection Agency issued the most recent permit shown in the record, it rated the Lander Street plant's capacity at 13.5 million gallons per day under federal treatment standards.

contained various formulas for allocating operating costs and capital contributions among user entities, such as the District, based on system-wide cost data.[5] With the advent of this new billing scheme, the seeds of a lawsuit were sown. The City asserted that the District's share should be based on the overall costs of treatment throughout the system. The District insisted that the allocable costs should be limited under the contract to those incurred with respect to the Lander Street operation.

A similar dispute evolved with respect to capital expenditures. Although the District had completed the capital investment required by the 1959 contract as amended in 1967, and had made an additional payment in 1971, the City claimed that these expenditures did not exhaust the District's responsibility. The City's contention—which the District accepted in principle, but resisted as to dollar amount—was based upon a relationship between sewage treatment standards and the capacity of the Lander Street plant. Because it is important to understand this relationship, we pause briefly to outline it here.

The Lander Street plant employs an "activated sludge process," in which organisms in the sewage consume nutrients in the sewage itself. This biological activity produces a relatively inert, solid substance usable as fertilizer. The solid substance is separated from the liquid sewage. Chlorine is added to the fluid, killing most of the remaining bacteria. The effluent then is released into the Boise River. Because the activated sludge process is biological, it generates a biochemical oxygen demand. The organisms in the sewage utilize oxygen as they consume the nutrients. The longer the sewage is held at the treatment plant, the more completely the nutrients are consumed and the less oxygen is demanded by surviving organisms after the effluent is released into the river. Consequently, more oxygen is available to other living creatures in the river, especially fish.

It is readily apparent that the capacity of a plant using this treatment process is determined not only by the physical volume of its equipment but also by the length of the processing time required to satisfy the applicable sewage treatment standards. For this reason, the advent of rigorous standards during the 1970s—which lengthened the required processing time at Lander Street—reduced the plant's effective capacity. Despite this reduction, the Lander Street plant remained capable of treating all of the District's sewage as well as a portion of the sewage originating elsewhere in the Boise metropolitan area. See footnotes 2 and 4, *supra.* Nevertheless, in order to make the City's treatment system more efficient, the Lander Street and West Boise plants were linked by a pipeline in 1984. Today, some sewage delivered for treatment at Lander Street may bypass the plant there and flow "downstream" through the pipeline to West Boise. This linkage of the two plants has underscored the issue of capital contributions beyond the District's investment in equipment at Lander Street.

The dispute over the District's share of operating costs and capital expenditures escalated into sharp conflict after the City began to bill the District under the "User Charge System" in 1979. The District refused to honor these bills, tendering instead the amounts it deemed payable under the contract. The City eventually brought this action, seeking a judicial reformation

5. The City's new billing policy arose not only from a desire to collect more money from the District but also from a desire to establish a uniform system of pro rata charges among all users of the municipal sewage treatment facilities. In addition to the Bench Sewer District, these users included the Northwest Boise Sewer District, the West Boise Sewer District, and Garden City. Such a uniform charging system was a condition placed by the United States Environmental Protection Agency upon federal funding for the West Boise plant and other sewer system improvements. When the parties brought the instant case to court, the district judge was asked to determine the impact of the EPA's funding condition upon the contract between the City and the Bench Sewer District. In a ruling not challenged by the City on appeal, the judge held that the District's contractual obligations could not be unilaterally altered by the City through its transactions with the EPA. Because this issue has not been presented to us, we express no view concerning it.

of the contract. The district court held in favor of the City, reforming the contract and entering a judgment against the District for $737,896.46 in unpaid operation costs and $241,877.79 in additional capital outlays. The court also ordered the District to pay the City's future billings under the reformed contract, and authorized the City to assess "sewer treatment connection fees" directly against residents making new hook-ups in the Bench area. This appeal followed.

## II

The district judge's decision focused largely upon the impact of sewage treatment standards promulgated after the amendment to the Water Pollution Control Act in 1972. Characterizing this impact as "dramatic" and "unforeseeable," the judge held that the standards had rendered "unenforceable" that part of the contract which specified the District's obligation to make payments based on gallonage treated and costs incurred at Lander Street. The judge reformed the contract to require that the District pay "the reasonable value" of sewage treatment services. He equated this value with charges based on the City's "User Charge System." He then invoked the doctrine of unjust enrichment to award previously unpaid operating costs and additional capital contributions to the City.

■ On appeal, the parties have vigorously debated whether the post–1972 treatment standards were truly "unforeseeable." Their arguments have centered on the doctrine of impracticability of performance, as set forth in the RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981):

> *Discharge by Supervening Impracticability.* Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.

Under this doctrine, the threshold question, which must be answered before reaching the foreseeability issue, is whether a party's performance has been rendered impracticable. That question is dispositive of the instant case.

The City asserted in the district court that its performance of the contract had become impracticable because it could not collect from the District the higher costs resulting from stricter treatment standards. The judge implicitly agreed, declaring the contract "too restrictive." The City urges us to uphold this determination as a finding of fact. But it is a question of law—or, more precisely, a mixed issue of law and fact—whether the doctrine of impracticability is applicable to a given case. *Mitchell v. Ceazan Tires, Ltd.,* 25 Cal.2d 45, 153 P.2d 53 (1944) (cited in introduction to SECOND RESTATEMENT § 261). *See also, Landis v. Hodgson,* 109 Idaho 252, 706 P.2d 1363 (Ct.App.1985), and *Lawrance v. Elmore Bean Warehouse, Inc.,* 108 Idaho 892, 702 P.2d 930 (Ct.App.1985) (appellate court in each case reaching its own conclusion regarding applicability of the impracticability doctrine). The question is one of free review on appeal.

Before any court can determine whether a contract should be reformed, or whether a defective contract has produced an unjust enrichment, the court must ascertain what the contract means. This meaning may be discerned from the language of the contract itself and from the parties' mutual course of conduct in implementing the contract. *See generally Commercial Credit Corp. v. S & E Enterprises, Inc.,* 97 Idaho 441, 546 P.2d 396 (1976).

Here, as we have noted, the contract (including the 1967 amendment) provided that the District would pay for plant operations and for "unusual repairs or replacements," according to a pro rata share of costs actually incurred in the Lander Street operation. The contract did not limit the factors affecting operational costs to those occasioned solely by treatment of the District's sewage. Neither did it bar cost increases indirectly caused by general population growth or by changes in sewage treatment standards. Rather, it simply required the costs to arise in connection with

operation of the plant at Lander Street. The parties, by their subsequent conduct, gave further meaning to this requirement. As mentioned above, the City included an administrative charge as part of the annual operations cost. For many years, this administrative charge was computed as one-half the salaries earned by the City's two senior managers of the entire sewer system. By this conduct the parties gave a broad, commonsense interpretation to the requirement that chargeable costs be incurred in the operation of the Lander Street plant. So understood, the contract provided a mechanism for sharing increased costs.[6]

Similarly, the parties by their conduct gave further meaning to the phrase "unusual repairs or replacements." The word "replacements" was not defined in the contract. It might have referred narrowly to replacement of existing equipment or more broadly to replacement of plant capacity. As we have seen, plant capacity could be effectively diminished by increases in treatment standards. Thus, a replacement of lost capacity might require the installation of new, additional equipment. The District apparently gave the contract this broader meaning by contributing to the acquisition of additional equipment in 1971. Moreover, as mentioned earlier, the District has accepted in principle the City's contention that additional capital contributions should be made. The district has disputed only the method used by the City to compute the contribution—an issue to which we will turn later.

Therefore, the contract, as amended in writing and as supplemented by the parties' mutual course of conduct, does not lack a mechanism for accommodating increases in sewage treatment costs due to more rigorous standards. It requires the District to make capital contributions in order to maintain the effective capacity of the treatment system. It also requires the District to pay for operations according to the City's actual costs, subject only to the

requirement that such costs be incurred with respect to operations at Lander Street. With this interpretation, the contract does not depart greatly from the "reasonable value" scheme contemplated in the trial court's judgment. The contract merely protects the District from costs other than those incurred for the treatment of sewage delivered at Lander Street, and from capital contributions for the purpose of expanding the system to meet increased demand outside the District.

▮ The question, then, is whether this modest protection renders the contract unenforceable under the doctrine of impracticability. We think not. We acknowledge that the contract may inhibit the establishment of a simple, undifferentiated billing system for all users of the City's sewage treatment facilities. Indeed, such a system may be the optimal means of financing sewage treatment services today. However, as noted at the outset of this opinion, a contract embodies the choice of a planned future over the risk that subsequent events may cause the plan to become undesirable for one of the parties. The law generally enforces such choices because, even though a particular agreement may prove to be improvident, contracts as a whole benefit society by contributing to the rational ordering of human affairs. Equity will not intervene unless a contract is unlawful, violates public policy, or produces unconscionable harm (where the doctrine of unconscionability applies). *Quintana v. Anthony,* 109 Idaho 977, 712 P.2d 678 (Ct. App.1985). It is not sufficient that the contract produces a suboptimal or inconvenient result, viewed in hindsight. Accordingly, we conclude that the contract in this case is enforceable. It need not, and should not, have been reformed.

### III

The next question is what charges properly should be made, under the contract,

---

6. For example, during the years 1976 to 1979—when the West Boise plant was in existence, but the City was continuing to bill operation costs attributable to Lander Street under the contract—the pro rata charges rose from $144.25 per million gallons to $201.03 per million gallons.

for operation costs and for capital expenditures. We will discuss each category separately.

## A

The District contends that the trial judge erred in awarding the City $737,896.46 in unpaid operation costs. The District argues that the City did not prove a connection between many of the items charged and the operation at Lander Street. Particularly, the District challenges those costs described in the City's audited financial statements as "interfund transactions." These transactions represent expenses charged to the City's "sewer enterprise fund" by other City departments.

The trial judge made no finding as to a relationship between these transactions and the treatment of sewage delivered at Lander Street. Of course, no such finding was required under the judge's approach to the case. But it is required in light of our decision upholding the contract. An absence of findings may be disregarded by an appellate court only when the record is clear and yields an obvious answer on the matter at issue. *Pope v. Intermountain Gas Co.*, 103 Idaho 217, 225, 646 P.2d 988, 996 (1982). Here, the record is complex, yielding no obvious answer. Some administrative costs, such as clerical salaries within the City's sewer department, plainly are allocable charges under the contract. But costs arising in other departments, such as a portion of the mayor's salary, do not have a readily apparent connection to the Lander Street operation. We direct the trial court on remand to determine which costs are incurred for the treatment of sewage delivered at Lander Street. This may be a difficult and imprecise task; however, it is one created by the contract itself and thrust upon the court by the parties' apparent inability to make their own determination.[7]

## B

As mentioned above, the City has insisted—and the District has agreed in principle to pay—additional capital contributions to the sewage treatment system. At trial the City propounded a mathematical formula, based on the District's sewage load, for calculating these contributions. The District agreed that the City's formula was valid, but the District asserted that the formula had been applied to inaccurate sewage load data. The District invited the trial judge's attention to other data. The judge decided to accept the figures used by the City, with some adjustments.

We need not delve deeply into the mathematics of the issue. It is sufficient to say that the capital cost allocation formula is a method for determining the plant capacity required to treat three components of sewage load: flow, biochemical oxygen demand (BOD), and total suspended solids (TSS). Flow is the quantity of sewage. BOD is the amount of oxygen necessary to convert raw sewage to inert fertilizer. This amount is related to the quantity of organic material in the sewage. TSS is the aggregate quantity of organic or inorganic solids found in the sewage. Generally, the higher the value of any variable in the formula, the greater the necessary plant capacity to treat the sewage. Thus, to calculate the District's utilization of the City's sewage treatment capacity, the District's highest recorded delivery of sewage would be determined and inserted into the formula.

The controversy in this case focuses upon the recorded delivery data. The

7. Under the contract, when the proper costs have been determined, they are included in the calculation of the "pro rata charge per million gallons" of sewage delivered at Lander Street. The City has argued that such a pro rata charge should be based not merely on gallonage but on a formula consisting of flow, biochemical oxygen demand and total suspended solids. As we note in the next section of this opinion, the District has agreed to a similar formula for determining capital contributions. However, upon the record before us, we cannot say whether the District has agreed to a parallel modification of the contract with respect to operational costs. One modification does not necessarily imply the other; the law does not demand symmetry in contracts. Because it is a question of fact whether a party actually has agreed to a change in a contract, this issue may be addressed by the district court on remand.

City's figures at trial were higher than those urged by the District. In part, the difference had to do simply with the accuracy of flow measuring devices. The trial judge determined that the District's measurements were more accurate, and he adjusted the City's computation of capital costs accordingly. The City has not challenged this determination.

However, the District also attacked the City's measurements of BOD and TSS. These components of the sewage load are determined by sampling the sewage itself. It was undisputed, in the testimony of experts at trial, that the only sampling technique recognized as scientifically valid is a practice known as "composite" sampling. Another technique, known as "grab" sampling, was condemned as invalid. The City's data was set forth in documents on which the word "grab" had been written prominently. The witness who prepared these documents testified that he did not know whether the samples were indeed "grab" samples, but he assumed they were. In contrast, the District offered BOD and TSS figures derived from "composite" samples.

Nevertheless, the trial judge used the City's figures, making no finding that they were derived from, or could be regarded as consistent with, "composite" sampling data. In this respect we are constrained to hold that the judge's determination was erroneous. Although the City's counsel now argues that the so-called "grab" sample data can be reconciled with the "composite" samples, we decline to make such a factual determination for the first time on appeal. We direct the trial judge on remand to make findings of BOD and TSS levels based on "composite" sampling, and to compute the capital cost allocation accordingly. If the judge finds a problem of availability or reliability in "composite" sampling data, then he may employ a sound alternative methodology.

As further guidance on remand, we note that the parties also disputed the proper time frame for measuring sewage deliveries. The evidence is uncontroverted that the quantity of sewage delivered by the District varies widely from hour to hour, from day to day, from week to week, from month to month, and (to a lesser extent) from year to year. The shorter the time frame, the greater the variety in sewage deliveries per period. Although the parties agreed that the District's share of capital expenditures should be based on the highest sewage delivery, they disagreed on the time period for measuring the delivery. The City presented evidence as to highest year for flow, the highest week for BOD, and the highest week for TSS. The District contended that among engineers, the proper period is deemed to be the month with the highest combination of flow, BOD and TSS. On remand the trial judge shall make a finding as to the proper period and then select the data accordingly.

IV

Finally, the District contends that the judge erred in authorizing the City to impose a "connection" fee directly against residents of the District making new hookups to the sewer system. The District argues that such a direct assessment would violate state statutory and constitutional provisions respecting the powers of municipal corporations in general and the authority of sewer districts in particular. The City responds that a direct assessment would not impinge on the District's lawful authority because the fee is intended to pay for future capital improvements that may become necessary to preserve the sewage system's excess treatment capacity. Additionally, the City contends that the fee would not duplicate any charge paid by Bench residents to the Sewer District because it would be assessed for a service— sewage *treatment*—that is distinguishable from the District's function of sewage *collection*. Although the City's position has been well argued by able counsel, we are unpersuaded.

The City seeks to make the direct assessment as an extension of its general policy of charging connection fees under section 8–11–3(B) of the Boise City Code. As originally enacted in 1973, the codified

ordinance provides, in pertinent part, as follows:

In addition to a trunk sewer connection charge, if a person, firm, partnership, corporation or association or any other sewer user lives, resides or is situate upon properties outside (a) an area now served by a sewer system (which system is hereby defined to include properties lying within the boundaries of pending local improvement districts) within the corporate limits of Boise City and (b) boundaries of sewer districts as those corporate limits and boundaries are constituted on the date of the enactment of this ordinance, then such person connecting to any sewer system transporting sewage, industrial waste water or other wastes and liquids to a Boise City treatment plant shall pay a connection charge, and such charge shall be made and imposed upon and collected from such sewer users.

Although somewhat inartfully worded,[8] the ordinance clearly requires persons connecting to any sewer system—such as the Bench Sewer District system—to pay a connection fee to the City for use of its treatment facilities. We believe that the ordinance as applied to residents of the District conflicts with the existing authority of the District to assess such fees and, further, that it exceeds the power of the City vis-a-vis the jurisdiction of the District as an independent municipal entity under Idaho law.

As we have noted, the District was created in 1958. At that time the district court of Ada County entered an order providing that the District "shall have and exercise ... all of the powers and authority conferred upon sewer districts under and by virtue of Chapter 32, Title 42, Idaho Code ... and all laws thereunto enabling, and all such power and authority as may hereafter be conferred by law." The order

further declared that the district was created as a governmental subdivision of the state, "with all powers of a public or quasi-municipal corporation...."

■ Idaho Code § 42–3212 sets forth the powers exercisable by sewer district boards. Of particular application to this case is subsection (1) which authorizes the sewer district board to "fix and from time to time to increase or decrease ... *sewer rates, tolls or charges for services or facilities furnished by the district,* and to pledge such revenue for the payment of any indebtedness of the district. The board shall fix rates, tolls and charges and the time or times for payment thereof." (Emphasis added.) We perceive this section to be a legislative determination that sewer district boards shall assess the fees associated with services rendered to residents in their respective jurisdictions. This grant of authority to sewer district boards implicitly withdraws the same power from any geographically coextensive municipality such as a city or county. There cannot exist two municipalities exercising the same or essentially similar powers within the same territory at the same time. *People ex rel. Greening v. Bartholf,* 388 Ill. 445, 58 N.E.2d 172 (1944), *Rash v. Louisville & Jefferson County Metropolitan Sewer District,* 309 Ky. 442, 217 S.W.2d 232 (1949). *Compare, Davis Management, Inc. v. Sanitary and Improvement District No. 276 of Douglas County,* 204 Neb. 316, 282 N.W.2d 576 (1979) (two municipal corporations may operate in same territory at same time for different purposes).

Here, of course, the City contends that it is not exercising powers coextensive with those of the District because the District merely provides sewage collection while the City provides sewage treatment. However, we think the City's attempt to create a · distinction between ultimate sewage treatment and the function being per-

---

**8.** The ordinance has been amended numerous times to increase the base rates charged. In addition, the language has been clarified. The most recent version contained in the record provides as follows:

In addition to a trunk sewer connection charge, a person constructing a sewer service

line by which to attach and connect the property to any sewer system transporting sewage ... to a Boise City treatment plant shall pay a connection charge, and such charge shall be made and imposed upon and collected from such sewer users.

formed by the District is ill-conceived. Title 42, chapter 32, empowers sewer districts to "provide for sewage disposal." *See* I.C. § 42–3202. Disposal necessarily includes treatment. The District in this case is disposing of sewage, having chosen to contract with the City for treatment services. The City cannot now disregard this contract and directly charge District residents for a service which they already are receiving by and through the District.[9]

A municipal ordinance must be confined to the jurisdiction of the governmental body enacting it. It may not be in conflict with the other general laws of the state. Idaho Const., art. 12, § 2. *See, e.g., Hobbs v. Abrams,* 104 Idaho 205, 657 P.2d 1073 (1983); *Clyde Hess Distributing Co. v. Bonneville County,* 69 Idaho 505, 210 P.2d 798 (1949); *In re Ridenbaugh,* 5 Idaho 371, 49 P. 12 (1897). Here, as we have explained, the ordinance as applied to District residents is in excess of the City's municipal jurisdiction and is in conflict with the statutory scheme governing sewer districts, as set forth in title 42, chapter 32. We conclude that the district court erred in authorizing the City to impose its connection charges upon the District's customers within the boundaries of the District.[10]

Accordingly, the judgment of the district court is vacated. The case is remanded for proceedings consistent with this opinion. Costs to appellant, the Bench Sewer District. No attorney fees on appeal.

---

9. The record does not reflect—nor do the parties argue—that the City has endeavored to charge a fee to District residents whose property is connected directly to City collection lines. Had such an issue been presented, our conclusion might have been different. *See, e.g., Johnson Homes, Inc. v. Southwest Metropolitan Water and Sanitation District,* 725 P.2d 12 (Colo.Ct. App.1986) (sewer district held entitled to recover sewer "tap" fee from developer of land annexed by city but within district boundaries, where district's fee was limited strictly to facilities that the district itself provided and where developer could have chosen to connect either to city or to district sewer lines).

10. The District has requested that we direct the trial judge to enter an injunction against further collection of hook-up fees. We leave it to the judge to decide, on remand, whether such an injunction will be necessary in light of our decision. We also note that the City has requested us to hold that if there are any refunds of hook-up fees previously paid, they must be offset by additional capital contributions from the District. Because that issue is not ripe for review, we cannot decide it here. The trial judge may address the issue if it is presented to him upon an adequate factual record.