Reversed and Remanded and Opinion filed August 14, 2003
















Reversed and Remanded
and Opinion filed August 14, 2003.                                               

 

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-02-00406-CV

____________

 

TRACTEBEL ENERGY MARKETING, INC. AND TRACTEBEL POWER, INC., Appellants

 

V.

 

E.I. DU PONT DE NEMOURS AND COMPANY, Appellee

 




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 



On Appeal from the 157th District
Court

                                                           Harris County, Texas                       

Trial Court Cause No. 99-32175




 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 


 

 



O P I N I O
N

            Tractebel Energy Marketing, Inc.
(“TEMI”) and Tractebel Power, Inc. (“TPI”) appeal from an adverse judgment in
their breach of contract action against E.I. DuPont de Nemours and
Company.  A jury found DuPont breached
the contract and caused TPI damages of $1.2 million, but excused the breach due
to commercial impracticability.  However,
the definition of impracticability given to the jury excluded two critical
elements, neither of which was supported by any evidence at trial.  Finding no evidence to support the only issue
found in DuPont’s favor, we reverse the judgment below and remand for judgment
in accordance with the remainder of the jury’s verdict.

            TPI designs and builds power
plants.  EPA regulations require certain
new sources of air emissions (like power plants) to offset anticipated increases
in overall emissions by purchasing emission reduction credits from existing plants.  Existing plants create these credits by
installing better technology or shutting down operations.  In connection with its plans to build a power
plant in New England, TPI engaged TEMI (an affiliate in the commodity trading
business) to find and purchase the credits it would need.  

            DuPont earned 7,649 tons per year of
NOx emission credits in 1983 by reducing emissions from its Repauno Plant in
New Jersey.  New
 Jersey law provides that future regulations can
reduce or eliminate these credits at any time,[1] a
fact confirmed in a letter to DuPont from the New Jersey Department of
Environmental Protection confirming the credits:

Should the regulation for an
applicable criteria pollutant become more restrictive than that of the time of
your reduction credit, the quantity banked will be discounted by the amount
required by the new regulation.  

In
1994, DuPont’s credits were cut almost in half, with the NJDEP again issuing
the same warning of potential future reductions.

            TPI (through TEMI as its agent)
contracted with DuPont to buy 1,000 tons of credits for $1 million on March 10,
1998.[2]  Shortly thereafter, NJDEP revoked the credits,
citing new regulations.  Deprived of its
credits, DuPont refused to perform. 
DuPont sued NJDEP for revoking the credits, and TPI[3]
sued DuPont.  DuPont later abandoned its
suit; TPI has not. 

            At trial, a jury found a contract
had been formed, DuPont had repudiated it, and TPI had incurred $1.2 million in
damages.[4]  The jury rejected DuPont’s defenses that
performance was excused by mutual mistake, unilateral mistake, or
impossibility, but agreed with its defense that performance was excused due to commercial
impracticability.  On that basis, the
trial court rendered judgment in DuPont’s favor.  TPI appeals, and DuPont cross-appeals.

Impracticability in Texas

            First, TPI argues commercial
impracticability is not recognized as a defense in Texas
except in the context of the sale of goods.[5]  Though Texas
courts rarely use that name, they have accepted the defensive doctrine under aliases.[6]

            Section 261 of the Restatement
(Second) of Contracts defines impracticability
in the following terms:

§ 261. Discharge by Supervening
Impracticability.

Where, after a contract is made,
a party’s performance is made impracticable without his fault by the occurrence
of an event the non-occurrence of which was a basic assumption on which the
contract was made, his duty to render that performance is discharged, unless
the language or the circumstances indicate the contrary.[7]  

In
three following sections, the Restatement addresses the general contexts in
which the defense has been accepted: (1) the death or incapacity of a person
necessary for performance,[8]
(2) the destruction or deterioration of a thing necessary for performance,[9]
and (3) prevention by governmental regulation.[10]  

            Texas courts have excused performance
in each of these situations (though not using the term impracticability).[11]  And in its most recent pronouncement on the
subject, the Supreme Court relied on sections 261 and 264 of the Restatement in setting out the proper elements of
the defense.[12]  Although the Supreme Court referred to the
defense as “impossibility” rather than impracticability, it is clear the Court
approved the substance of the Restatement sections regardless of the name
applied to the defense.[13]  Thus, we find the doctrine of commercial
impracticability as defined in the Restatement
does exist in Texas, and we overrule TPI’s first issue.     

            In its second issue, TPI contends
the trial court should have determined impracticability as a matter of law rather
than submitting the question to the jury. 
The states appear to disagree on the point.[14]  But in Texas, defenses to breach of contract
are generally considered questions for the jury unless the facts are uncontested.[15]  Here, the very existence of a contract was hotly
disputed, as were most of the elements required by the Restatement to establish
impracticability.  Under these
circumstances, the trial court properly submitted the impracticability question
to the jury.

Impracticability and Basic Assumptions

            In its remaining issues, TPI
challenges the form of the trial court’s jury question on impracticability, and
the sufficiency of the evidence to support the defense.  We review the former for an abuse of
discretion;[16] we
review the latter for any evidence supporting the verdict, considering it in a
light that supports the judgment and disregarding all evidence and inferences
to the contrary.[17]

            Generally, impracticability excuses
a party’s breach of contract when the contract itself doesn’t provide an escape
clause and the doctrine’s other requirements are satisfied.  Because courts cannot simply rewrite the
parties’ contract, the excuse is limited to circumstances in which both parties
held a basic (though unstated) assumption about the contract that proves
untrue.  This “basic assumption”
requirement is reflected in the Restatement,[18]
the Uniform Commercial Code,[19]
and federal common law.[20]

            In the Texas cases recognizing the
defense, the “basic assumption” of the parties is relatively obvious.  In a contract for personal services, the
death or incapacity of the person involved makes the contract impracticable for
obvious reasons.[21]  Similarly, a contract to lease or insure a
building is rendered impracticable if the building is destroyed.[22]  A change in the law that makes performance
illegal also renders it impracticable.[23]  In each of these circumstances, it takes
little imagination to see that both contracting parties entertained a basic
assumption about the contract that proved untrue.

            In this case, DuPont clearly had its
own credits in mind when entering the contract, but for this to be a basic
assumption of the contract there must be evidence that TPI did as well.[24]  The contract here did not specify the source
or ownership of the credits being sold. 
Although parties may understand a specific thing is needed for
performance based on prior dealings,[25]
there were no such dealings here.  

            Instead, the evidence indicates a
broker made the initial contact between the parties, but to protect his own position,
did not disclose to either the identity of the other until a deal was struck.[26]  Thus, TPI did not even know it was contracting
with DuPont until the agreement was made, and could not have understood that continued
validity of the Repauno credits was a basic assumption of the agreement.  

            DuPont contends the broker was
acting as TPI’s agent in the transaction, so his knowledge that DuPont was
selling its own credits must be attributed to TPI.  But this is not an invariable rule, as this
Court has previously held:

If a broker, under his contract
with his principal, is charged with no responsibility and is not obligated to
exercise any discretion, but his duty consists merely of bringing the parties
together so that, between themselves, they may negotiate a sale, and the sale
is made in that manner, the broker is considered a mere “middleman” and is not
necessarily the “agent” of either party.[27]

There
are good reasons here not to attribute the broker’s knowledge about DuPont to TPI,
as it is undisputed the broker kept the parties’ identities confidential to
protect his own position in the negotiations. 


            But even assuming TPI knew DuPont was
selling its own credits, this does not mean TPI understood that to be a basic
assumption of the contract.  According to
the Restatement, the defense of impracticability does not apply when both
parties know of the intended source if
it is not a basic assumption of both
parties that there will be no contract if that source fails.  This point is repeated in several illustrations:

·       
a seller’s knowledge of a buyer’s intended
source of funds is not a basic assumption of the contract unless the seller
understands there will be no sale if that source fails.[28]

·       
a farmer’s agreement to sell milk under a contract
that does not specify the source is not discharged if the farmer’s herd is
subsequently destroyed due to disease.[29]

·       
a manufacturer’s contract to sell a product it
makes is not discharged by the destruction of its factory so long as product
meeting the contract is available elsewhere on the market.[30]  

In
each case, one party’s assumption about the source of supply—and the other
party’s knowledge of that assumption—is not enough to excuse performance if alternative
sources of supply are still available to fulfill the contract.

            In this case, credits from another
source would have fulfilled the terms of the contract, and would have served TPI’s
purposes just as well.[31]  There is no evidence TPI contracted on the
assumption that DuPont’s credits and only
those credits were the subject of the contract.[32]  

            It is not surprising that the jury
reached a contrary conclusion, because the instruction they received did not
include this basic-assumption requirement.[33]  Generally, when a portion of the Restatement
has been adopted by Texas courts,
a jury question must incorporate the elements required by the Restatement.[34]  Both parties pointed out the omission and
objected to it; the record does not reflect why this critical element was excluded.

            Because TPI objected to the charge,
we measure the legal sufficiency of the evidence by the charge the trial court should have given.[35]  Applying that standard, we hold there is no
evidence the continued existence of DuPont’s credits was a basic assumption of both
parties in making this agreement, and the trial court erred in submitting
impracticability to the jury.[36]

Impracticability and Reasonable Efforts

            The basic-assumption element was not
the only one omitted from the definition of impracticability given to the
jury.  The Restatement also provides a
party claiming the defense must use reasonable efforts to surmount the obstacle
to performance:

[A] party is expected to use
reasonable efforts to surmount obstacles to performance . . . , and a
performance is impracticable only if it is so in spite of such efforts.[37]

An
illustration makes clear that a party blaming governmental regulations for nonperformance
must pursue all remedies reasonably available to avoid them:

A contracts to construct and lease
to B a gasoline service station.  A valid
zoning ordinance is subsequently enacted forbidding the construction of such a
station but permitting variances in appropriate cases.  [A] makes no effort to obtain a variance,
although variances have been granted in similar cases, and fails to construct
the station.  A’s performance has not
been made impracticable.  A’s duty to
construct is not discharged, and A is liable to B for breach of contract.[38]

            TPI argues DuPont failed to use
reasonable efforts by failing to pursue an appeal of the NJDEP decision to
cancel its credits.  The NJDEP based its cancellation
on regulations requiring DuPont to lower emissions effective as of June 30,
1998 (at the earliest) and June 30, 1999 (at the latest).  DuPont submitted a new emissions control plan
that was adopted on August 15, 1997.  On
March 30, 1998, the NJDEP decided the credits were eliminated as of the
adoption date of DuPont’s plan (seven months before the credit sale) instead of
the effective date of the regulations (three months after the sale). 

            Several DuPont witnesses (including
a former NJDEP executive) testified the cancellation was improper and unprecedented,
that cancellation of credits before the effective date of a new and more
restrictive regulation had never occurred before or since.  Indeed, DuPont filed a lawsuit challenging the
cancellation, but later voluntarily dismissed it.  DuPont witnesses explained the appeal was
dismissed because DuPont did not believe it could win, at least not in time to
effectuate the contract.  When pressed
for the basis of this opinion, DuPont claimed the attorney-client privilege.

             
The Restatement recognizes that even an invalid government regulation
may make performance impracticable, but again requires a party seeking
discharge to use reasonable efforts to avoid its application.[39]  Here, DuPont presented opinions that its efforts were reasonable, but no evidence to that effect.  Both at trial and on appeal, DuPont presented
neither evidence nor argument that it would have lost on the merits; to the
contrary, it has continued to insist the NJDEP acted improperly.  Nor is there any evidence or explanation why DuPont
could not have obtained an order approving the credit sale retroactive to the
date of denial.[40]  

            DuPont’s explanation for the voluntary
dismissal of its appeal cannot be enough—if all that is required to show
reasonable effort is evidence that “on advice of counsel we decided to do
nothing,” then no effort is required beyond a conversation with an attorney.  DuPont was not necessarily required to waive
its attorney-client privilege,[41]
but it was required to explain why abandoning the appeal was a reasonable thing
to do.  As it never did so, we find there
is no evidence DuPont took reasonable measures to challenge the NJDEP
revocation, and thus again cannot rely on the doctrine of impracticability.

The Agreement

            In its first cross-point, DuPont
argues there was no evidence DuPont and TPI had a contract because certain
conditions precedent went unfulfilled.  A
condition precedent is an event that must happen before a right accrues to
enforce performance.[42]  The existence of a condition precedent depends
on the parties’ intention as expressed in their contract,[43] using
its “plain grammatical meaning unless to do so would defeat the parties’
intent.”[44]  Conditions precedent are generally disfavored
in Texas.[45]  

            The jury found a contract was
reached in a telephone conference a broker arranged between DuPont and TEMI
(TPI’s agent) on May 10, 1998, and confirmed in writing by fax later that
day.  DuPont points to the following
portions of the confirmation the broker faxed to each party as the basis for
its allegation of unfulfilled conditions:

Conditions:     Dupont has seven
(7) business days to approve Tractebel Energy Marketing, Inc. with Dupont’s
external affairs department.  Once
approval has been given by Dupont, Tractebel Energy Marketing has seven (7)
business days to approve the transaction with Tractebel Energy Marketing,
Inc.’s board of directors.” [46]

Delivery:         Upon execution
of a NOx ERC sales agreement, Seller shall present a letter requesting ERC
transfer to the New Jersey Department of Environmental Protection (NJDEP) with
a copy to the Buyer.  Upon the earlier of
(i) entry of a record in the NJDEP ERC Registry that the purchased ERCs have
been committed to or used by Buyer, or (ii) receipt of written confirmation
from the NJDEP that interest in purchased ERCs has been transferred to Buyer,
Buyer shall forward payment in full to Seller within three (3) business days. 

 

Regarding
the Conditions section, DuPont concedes its external affairs department
approved TEMI, and it is undisputed TEMI’s board of directors approved the
transaction as well.  There is no mention in this section of any
other condition.

            In
the Delivery section, it is clear the matters therein are payment and delivery
terms, and not conditions precedent. 
First, that is what the section’s title says they are.[47]  Second, the last sentence does not condition
the sale on NJDEP approval, but merely provides when TEMI had to pay for the
credits.  Third, though the remaining
sentence indicates the parties intended to sign a written sales agreement, an
intention to sign a formal contract later does not mean there is no contract.[48]  If the parties intend to be bound, their
intention to sign a more formal document is not a condition precedent to their enforcement.[49]  Thus, when it is disputed whether the parties
intended to be bound by the initial agreement, the question is one of fact for
the jury.[50]

            Here, the issue of intent to be
bound was hotly contested, and reasonable minds could find either way.  Thus, the trial court did not err in asking
the jury whether the parties reached a binding agreement, and there is
sufficient evidence to support its affirmative answer.

Agency

            In its second cross-point, DuPont
challenges the jury’s finding that TEMI acted as TPI’s agent in contracting
with DuPont, and argues TPI has no standing as a matter of law.  DuPont points to evidence of disharmony
between TPI and TEMI,[51] and
argues neither could have been the agent of the other because neither was
acting like a fiduciary.  But the
existence of a fiduciary relationship is a result
of an agency relationship, not an element
of it.[52]  Evidence that an agent may have breached its fiduciary
duty to its principal does not prove no agency ever existed.

            Additionally, Dupont argues there
was no documentation of any agency agreement, and that TPI could not control
TEMI because the two were “on the same level” within the Tractebel family of
companies.[53]  First, an agency agreement does not have to
be in writing.[54]  Second, a company’s status in a corporate
hierarchy does not limit its power to agree to act as an agent; clearly, a
parent corporation could agree to serve for some purposes as an agent of one of
its lowly subsidiaries.[55] 

At trial, representatives of both TPI and TEMI testified the
latter was acting as agent for the former. 
A copy of an e-mail from TEMI to TPI was admitted reporting the status
of negotiations and requesting “more definite instructions” regarding the DuPont
deal.  It was undisputed TPI was in the
business of building power plants that could use the credits, while TEMI was in
the business of trading commodities for others on commission.  Finally, TPI was to pay TEMI a commission had
the sale been completed.  In sum, DuPont
did not establish as a matter of law that no agency relationship existed, and
the record contains more than a scintilla of evidence to support the jury’s
finding to the contrary.[56]

 

 

Impossibility

            In its final cross-point, DuPont
argues the evidence conclusively established that performance under the parties’
agreement was impossible due to the NJDEP revocation, and the jury’s answer to
the contrary was improper.[57]  In Centex
Corp. v. Dalton, the Supreme Court excused performance of a contract to pay
a finder’s fee when an agency ruling made it illegal to pay such fees.[58]  But here, while the NJDEP revocation may have
made it impossible for DuPont to sell its
own credits (assuming no successful appeal of that order), the NJDEP did
not make it illegal for DuPont to sell any
other credits to TPI.  DuPont could
have attempted other avenues of performance, including creating new credits or
buying credits from another source to fulfill its obligation.  Though DuPont argues on appeal that it was impossible
to do so, that evidence was disputed at trial.[59]  Accordingly, DuPont did not establish
impossibility as a matter of law.

Conclusion

            In sum, we find there was sufficient
evidence to support every one of the jury’s answers, with the exception of the
impracticability question that omitted crucial elements.  Finding no evidence to support the only issue
the jury found in DuPont’s favor, we reverse the judgment below and remand for
judgment in accordance with the remainder of the jury’s verdict.  On remand, the trial court is instructed to consider
TPI’s request for 

 

attorney’s
fees and costs, and to render a final judgment for TPI in accordance with this
opinion.

 

                                                                                    /s/        Scott Brister

                                                                                                Chief
Justice

 

Judgment
rendered and Opinion filed August 14, 2003.

Panel consists of Chief Justice
Brister and Justices Fowler and Frost.











[1] See N.J.
Admin. Code tit. 7, § 27-18.8.

 





[2] As
discussed more fully below, DuPont challenges the jury’s finding that a
contract was made and that TEMI acted as agent for TPI. 

 





[3]
The suit and this appeal were brought on behalf of both TPI and TEMI.  As the latter purported to act only as agent
for the former and claims no recovery in its own right, we refer to both by the
principal’s name.

 





[4] The
jury question defined damages as “[t]he difference, if any, between the market
value of [the credits] at a commercially reasonable time after TEMI learned of
the repudiation, and the [contract] price.”

 





[5] See Tex.
Bus. & Com. Code § 2.615 (excusing performance of contract to sell
goods based on impracticability).

 





[6] See, e.g., Ramirez Co. v. Hous. Auth. of
City of Houston, 777 S.W.2d 167, 173 n.11 (Tex. App.—Houston [14th Dist.] 1989,
no writ) (recognizing impossibility of performance, commercial impracticability,
and frustration of purpose as excuses for non-performance); see also Richard A. Posner & Andrew
M. Rosenfield, Impossibility and Related
Doctrines in Contract Law: An Economic
Analysis, 6 J. Legal Stud.
83, 86 (1977) (stating no functional distinction exists among doctrines of
impossibility, impracticability, and frustration of purpose).

 





[7] Restatement (Second) of Contracts § 261
(1981).





[8] Id. § 262.

 





[9] Id. § 263.

 





[10] Id. § 264.

 





[11] See infra, notes 21-23.

 





[12] See Centex Corp. v. Dalton, 840
S.W.2d 952, 954 (Tex. 1992).  

 





[13] Id. at 954; see also Walden v. Affiliated Computer Servs., Inc., 97 S.W.3d 303,
325 (Tex. App.—Houston [14th Dist.]
2003, pet. filed) (citing Centex but
finding no legal impediment to performance when order at issue had terminated
prior to trial).

 





[14]
The Restatement says that the question of impracticability “is generally
considered to be one of law rather than fact.” 
Restatement (Second) of Contracts
ch. 11, introductory note, p. 310 (1981). 
However, the very case cited by the Restatement in support of that
position suggests it is a mixed question of law and fact.  See
Mitchell v. Caezan Tires, Ltd., 153 P.2d 53, 54 (Cal. 1944)
(“[impossibility] is a conclusion of law drawn by the court from the facts of a
given case, and although the trial court found both as a finding of fact and as
a conclusion of law that the defendant’s business was . . . ‘impossible,’ the
evidence does not establish that the sale of new tires was made illegal or
impossible.”).  Some jurisdictions have
viewed the question strictly as one of law. 
See, e.g., Mortenson v. Scheer,
957 P.2d 1302, 1305 (Wyo. 1998); T.S.I. Holdings, Inc. v. Jenkins, 924
P.2d 1239, 1248 (Kan. 1996).  Others have viewed it as a mixed question of
law and fact.  See, e.g., City of Boise v. Bench Sewer Dist., 773 P.2d 642, 646
(Ida. 1989); Cleasby v. Leo A. Daly Co.,
376 N.W.2d 312, 318-19 (Neb.
1985).  The uniform or pattern jury
charges in several additional states include instructions for
impracticability.  See 1 Cal. Jury Instructions—Civil
§ 10.81 (9th ed.); N.M. Stat. Ann.,
Uniform Jury Instructions—Civil No. 13–840; Vernon’s
Okla. Forms 2d, Uniform Jury Instructions—Civil No. 23.37; 6A Wash. Prac., Pattern Jury
Instructions—Civil No. 302.09 (4th ed.).

 





[15] See, e.g., Hathaway v. Gen. Mills, Inc.,
711 S.W.2d 227, 228-28 (Tex. 1986) (holding issue of modification depends on
the intent of the parties and is for the jury to determine); James T. Taylor & Son, Inc. v.
Arlington ISD, 160 Tex. 617, 335 S.W.2d 371, 376 (Tex. 1960) (holding unilateral
mistake is question of fact for the jury unless the court can make the
determination from undisputed evidence); Chastain
v. Cooper & Reed, 257 S.W.2d 422, 424 (Tex. 1953) (holding that absent
an express agreement, novation is a question of fact).

 





[16] See Texas Dept. of Human Servs. v. E.B., 802
S.W.2d 647, 649 (Tex. 1990).

 





[17] Lee Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778,
782 (Tex. 2001).

 





[18] Restatement (Second) of Contracts § 261
cmt. b; see also Juarez v. Hamner, 674 S.W.2d 856, 861 (Tex. App.—Tyler 1984, no writ).

 





[19] See Tex.
Bus. & Com. Code § 2.615(a) (including “basic assumption”
requirement in defining impracticability in the sale of goods); see also Robberson Steel, Inc. v. J. D.
Abrams, Inc., 582 S.W.2d 558, 560 (Tex. Civ. App.—El Paso 1979, no writ).

 





[20] See United States v. Winstar Corp., 518 U.S.
839, 904–05 (1996) (including “basic assumption” requirement in applying
impossibility doctrine to sovereign acts defense).

 





[21] See, e.g., Nutt v. Members Mut. Ins. Co.,
474 S.W.2d 575, 578 (Tex. Civ. App.—Dallas 1971, writ ref’d n.r.e.) (excusing
employer’s duty to pay salary to deceased corporate officer); Salter v. Jones, 348 S.W.2d 381, 383
(Tex. Civ. App.—El Paso 1961, no writ) (holding illness excused performance of
party to personal services contract).

 





[22] See, e.g., Erickson v. Rocco, 433 S.W.2d
746, 751 (Tex. Civ. App.—Houston
[14th Dist.] 1968, writ ref’d n.r.e.) (holding duty to keep insurance on house
was extinguished when house burned to the ground and thus had no insurable
value); Senter v. Dixie Motor Coach Corp.,
67 S.W.2d 345, 347 (Tex. Civ. App.—Dallas 1933) (excusing performance of lease
agreement when building subject to lease was damaged by fire), aff’d, 97 S.W.2d 945 (Tex. Comm’n App.
1936).

 





[23] See Centex, 840 S.W.2d at 954–56; see also Restatement § 261 cmt. e (distinguishing between cases in
which performance is excused because it is objectively impracticable [“the
thing cannot be done”] and those in which it is not excused because it is
merely subjectively impracticable [“I cannot do it”]).

 





[24] Restatement (Second) of Contracts § 261
cmt. b.   

 





[25] Id. § 263 cmt.
b & illus. 7 & 8.

 





[26] A
transcript of the following telephone conversation between representatives of
the broker, DuPont, and TEMI was admitted at trial:

Broker:     Okay.  I’ve got the buyer and seller on the
line.  I would like to outline the
business terms of this transaction.

DuPont:   Okay.

Broker:     And I’m just going to
read through this real quickly.  If you
have any questions, please stop me.  A
private NOX emission reduction credit transaction for permanent overcontrol New
Jersey ERCs (oxides of nitrogen).  The
quantity concerned is 1000 tons per year of New Jersey Permanent Overcontrol
credits.  The trading price is $1000 per
ton.  The uh . . . there are some
conditions precedent.  The seller would
like seven business days to approve with their External Affairs Department the
name of the purchaser.  The purchaser
would like seven business days after the date of which the seller approves the
buyer . . . after the seller agrees to take the buyer’s name, to uh . . .
receive final Board approval and with that, we would do a simple
straightforward transaction.  We can
confirm this by the end of the day.  Are
there any questions?

                  . . . .

Broker:     All
right. . . .  [S]eller, please state your
name and company name for the tape.

DuPont:   Katherine
H. Stone, DuPont Company.

Broker:     All right.  Thank you very much.  Buyer, please state your name and company
name for the tape.

TEMI:      Robert
Wilson, Tractebel Energy Marketing, Inc.

Broker:     All
right.  Thank you very much.  This deal is closed. . . .

 





[27] Rauscher Pierce Refsnes, Inc. v. Great Southwest Sav., F.A., 923 S.W.2d 112, 115 (Tex.
App.—Houston [14th Dist.] 1996, no writ). 
DuPont did not obtain a jury finding that the broker was TPI’s agent.





[28] Restatement (Second) of Contracts § 261
illus. 2.

 





[29] Id. illus 12.

 





[30] Id. § 263
illus. 1.

 





[31]
One of DuPont’s lead negotiators on the agreement, Tyrone Chichester, testified
that credits from a source other than the Repauno facility would have fulfilled
the contract.  DuPont’s argument that
other sources were not available is discussed below in the “Reasonable Efforts”
section.

 





[32] Restatement (Second) of Contracts § 263
cmt. a; see also United Sales Co. v. Curtis Peanut Co., 302 S.W.2d 763, 766 (Tex.
Civ. App.—Dallas 1957, writ ref’d n.r.e.) (“It is not enough to show merely
that because of events occurring since the making of the contract it has become
impossible to obtain a commodity contracted for from a source contemplated by
the parties, where the contract does not specify that the commodity is to be
obtained there, even though it would have been more expensive to obtain it
elsewhere.”).





[33] Question 6 in the charge read:

Was DuPont’s repudiation of the
agreement excused due to commercial impracticability?

 Impracticability
occurs when: (1) the cost of performing the agreement has become totally
unreasonable or impracticable because of an occurrence that was beyond the
control of the parties; and (2) the parties could not reasonably foresee the occurrence
when they made the agreement.

 Performance
may be impracticable because of extreme and unreasonable difficulty, expense,
injury, or loss to one of the parties will be involved [sic].  Increased cost alone does not excuse
performance of an agreement unless the rise in costs is due to some unforeseen
contingency which alters the essential nature of the performance of the
agreement.

                     





[34] See St. Joseph Hosp. v. Wolff, 94 S.W.3d
513, 530 (Tex. 2003) (finding
trial court erred in submitting definition that did not track Restatement
language previously adopted by court).

 





[35] Id. at 530.

 





[36]
Because no issue should have been submitted, the error in the charge is moot
except as it affects our review of legal sufficiency.  Id. at 530, 534.





[37] Restatement (Second) of Contracts § 261
cmt. d; see also id. § 264 cmt. b, Galveston, H. & S.A. Ry. v. Karrer, 109
S.W. 440, 441 (Tex. Civ. App.—San Antonio 1908, no writ).

 





[38] Restatement (Second) of Contracts § 261
illus. 11.

 





[39] Id. § 264 cmt.
b.

 





[40]
Because the issue is not before us, we mean to imply nothing about the validity
of such an order.  We merely point out
that there is no evidence showing such an order could not have been obtained,
and thus nothing to support DuPont’s claim that its dismissal was reasonable.

 





[41]
Because neither party asserts nor briefs the issue, we do not reach the
question whether DuPont waived its attorney-client privilege by relying on
advice of counsel to support its affirmative defense of impracticability.  See
Republic Ins. Co. v. Davis, 856
S.W.2d 158, 163 (Tex. 1993) (barring offensive use of attorney-client privilege
by parties seeking affirmative relief); cf.
Valero Energy Corp. v. M.W. Kellogg Constr.
Co., 866 S.W.2d 252, 256 (Tex. App.—Corpus Christi 1993, writ denied)
(barring offensive use of attorney-client privilege by party asserting an
affirmative defense).

 





[42] Centex, 840 S.W.2d at 956.





[43] Criswell v. European Crossroads S. Ctr.,
792 S.W.2d 945, 948 (Tex. 1990).

 





[44] DeWitt County Elec. Co-op. v. Parks, 1
S.W.3d 96, 101 (Tex. 1999).

 





[45]             In construing a contract, forfeiture by finding a
condition precedent is to be avoided when another reasonable reading of the
contract is possible. . . .  When the
intent of the parties is doubtful or when a condition would impose an absurd or
impossible result, the agreement will be interpreted as creating a covenant
rather than a condition. . . .

Criswell, 792 S.W.2d at 948.

 





[46]
The transcript of the telephone conference between the broker and the parties
only mentions these same two conditions precedent.  See
supra, note 26.





[47] DuPont contends conditions
precedent can occur anywhere in an agreement, citing South Texas Medical Clinics, P.A. v. Phycor, Inc., 113 F. Supp. 2d
1094, 1099 (S.D. Tex. 2000) (finding conditions precedent language existed in
“accounts receivable” section of contract). 
However, even assuming that to be the case, the location of the language
within a contract may certainly be relevant to its construction.  See
Criswell., 792 S.W.2d at 948 (stating that in determining whether a
condition precedent exists, intention of parties must be ascertained from
looking at entire agreement).

 





[48] Scott v. Ingle Bros. Pac., Inc., 489
S.W.2d 554, 556 (Tex. 1972); Murphy v. Seabarge, Ltd., 868 S.W.2d
929, 933 (Tex. App.—Houston [14th Dist.] 1994, writ denied).

 





[49] Foreca, S.A. v. GRD Dev. Co., 758 S.W.2d 744, 746 (Tex.
1988).

 





[50] Id.; Murphy, 868 S.W.2d at 933.

 





[51]
DuPont points to evidence suggesting TEMI cared more about its interest than
those of TPI and that TEMI only looked at circumstances from its perspective
rather than TPI’s.  DuPont does not argue
that either entity owed it a fiduciary duty.

 





[52] See, e.g., O’Bryant v. Century 21 S. Cent.
States, Inc., 899 S.W.2d 270, 271 (Tex. App.—Houston [14th Dist.] 1995, no
pet.).

 





[53]
DuPont argues TPI had no right to control the “means and details” of TEMI’s
purchase of credits, but the charge instructed only that a principal had the
right to “control” an agent.  As DuPont
did not object to the instruction, we measure the evidence against the charge
as submitted.  See Wolff, 94 S.W.3d at 530.

 





[54] Rollingwood Trust No. 10 v. Schuhmann,
984 S.W.2d 312, 316 (Tex. App.—Austin 1998, no pet.).

 





[55] Restatement (Second) of Agency
§ 14M cmt. a (1958).

 





[56] See Lee Lewis Constr., 70 S.W.3d at 782.





[57] The jury answered the following question in the
negative:

 

Was DuPont’s repudiation of
the agreement excused due to impossibility?

Impossibility occurs when:
(1) the agreement has become impossible to perform because of an occurrence
that was beyond the control of the parties; and (2) the parties could not
reasonably foresee the occurrence when they made the agreement.  “Impossible” means that neither DuPont nor
anyone else could have performed the agreement.

 





[58] See Centex, 840 S.W.2d at 956.

 





[59]
In its brief, DuPont concedes the existence of almost 1,500 other credits
banked with the NJDEP.  DuPont presented
evidence it could not purchase those credits, but there was conflicting
evidence about how hard it had tried.